**Michael Levine (ml5153)**
**Levine & Associates, P.C.**
15 Barclay Road
Scarsdale, NY  10583
Telephone (914) 600-4288
Facsimile   (914) 725-4778
Cell Phone (917  855-6453

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| **KAMIN HEALTH LLC,** | :   **Docket No. 20 Civ 5574** |
| **Plaintiff,** | : |
| - against - | : **DECLARATION IN OPPOSITION** |
| | **TO MOTION FOR PRELIMINARY** |
| **PINCHAS HALPERIN and PINCHAS** | : **INJUNCTIVE RELIEF AND IN** |
| **HALPERIN LLC,** | **SUPPORT OF CROSS-MOTION TO** |
| **Defendants.** | : **COMPLE ARBITRATION** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        **Pinchas Halperin**, hereby declares, pursuant to 28 U.S.C. § 1746, as follows, under the

penalty of perjury:

        1.  I am a Defendant in the within action and, as such, am fully familiar with all of the facts

and circumstances as are hereinafter set forth.  I Affirm, rather than swear, for religious reasons.

        2.  This Declaration is submitted in opposition to Plaintiff's motion for omnibus injunctive

relief and in support of Defendants' cross-motion to compel arbitration of any issues regarding the

use of what Plaintiff claims to be its unregistered "trademark."

                    **SUMMARY OF ARGUMENT**

        3.

## THE FACTUAL BACKGROUND

### I. *The Original Dispute, the Arbitration and the Restraining/Injunction Orders*

4.  On September 17, 2018, Defendant Pinchas Halperin LLC ("PHL"), an entity of which I am the sole Member, and U.C. Management LLC ("UCM"), an entity owned by the individual Yitzchok Kaminetzky ["Kaminetzky"]), caused Kamin Health Williamsburg LLC ("KHW") to be formed pursuant to the provisions of New York's Limited Liability Company Law.  The ownership of KHW was 50% Pinchas Halperin and 50% U.C. Management LLC.

5.  From the time of its formation, and to the time Kaminetzky improperly abandoned the business (as described below), KHW has been in the business of providing management services for an urgent care facility located at 70 Lee Avenue, Brooklyn, New York, which facility provides medical services and care for non-life threatening and/or temporary injuries and illnesses and other medical conditions on a "walk-in" basis.

6.  On or about October 4, 2018, PHL and UCM entered into a written Operating Agreement (the "Operating Agreement") providing for the management and affairs of Kamin Health.  A copy of the Operating Agreement is annexed hereto and labeled Exhibit "1".[1] Kaminetzky was designated as the manager (on behalf of UCM) of KHW [§ 7].  The Operating Agreement required that all funds of KHW be deposited solely into a bank account in the name

---

[1]  The term "Kamin" was defined, in the preamble of the Operating Agreement, as "U C Management LLC," an entity wholly owned by Kaminetzky.  Although Plaintiff Kamin Health LLC was not a named party to that Agreement, it was a *de facto* party thereto since UCM granted a license for the use of the "Kamin Health" supposed trademark.  Specifically, the Operating Agreement provided, at ¶ 8 (at the end of page 4), that "Kamin shall contribute the license to the use of the brand name "Kamin Health" by the LCC [KHW], at no cost, which license shall continue for so long as Kamin owns its membership interest in the LCC."  Thus, not only did the Operating Agreement profess to establish that UCM (*not* Kamin Health LLC) owned any purportedly existing Kamin Health trademark, but it also granted a continuing license to use the same as long as Kaminetzky continued to have any interest in KHW.

of KHW on which I was required to be one of the signatories.  Withdrawals could be made only in the regular course of business of KHW.  [§ 11].

7.   The Operating Agreement further provided that, in the event that any dispute arose among the parties, the same would be determined by a Rabbinical Court and "judgment upon the award rendered or regarding enforcement of the Rabbinical Court's rulings may be entered or enforced, as the case may be, in the Courts located in the State of New York, County of Kings …" [§ 17].  Specifically, it stated that "[a]ny and all controversy, claim, dispute etc. *in any way relating to, arising under or resulting from*" the Operating Agreement must be submitted for arbitration to the said panel "and not to any secular court, tribunal of the like …" (emphasis added).  Clearly, as discussed in more detail hereinbelow, the use of a purported trademark for which a license was supposedly granted *by the Operating Agreement* is a controversy both relating to and arising under the Operating Agreement.

8.   Finally, the Operating Agreement further provided that, in the event that Kaminetzky commingled funds belonging to KHW with any funds belonging to any other entity, Kaminetzky would be removed as Manager of KHW "upon motion of" PHL. [§ 7].[2]

9.   In or about July of 2019, I discovered that, contrary to our agreement, Kaminetzky had been causing funds belonging to KHW to be deposited into a bank account not in the sole name

---

[2]  The reason for that provision – inserted at my insistence – was because Kaminetzky had other urgent care facilities with other partners/investors in different locations: Boro Park Urgent Care, Crown Heights Urgent Care and Union Medical Urgent Care (in Monsey).  I agreed to invest up to $600,000 into KHW, which had nothing to do with those other entities and wanted to make sure that funds received by KHW would not be diverted to any of the entities owning or operating those other, separate facilities.  To insure that Kaminetzky could not block that removal if he comingled funds, the Operating Agreement provided that he would be removed as Manager on mere "motion" by PHL (i.e., me), and not by any subsequent voting requirement that Kaminetzky could vote against and thereby defeat.  If Kaminetzky had the ability to defeat his removal as manager if he comingled funds, my critical right to remove him would be meaningless.

of KHL, and not one where I was a signatory, but rather Kaminetzky was causing KHW funds to be deposited into a comingled account that Kaminetzky used for his other businesses.

10.   As a result, on July 12, 2019, I caused to be delivered to Kaminetzky and UCM a notice that, upon the motion of PHL, UCM had been removed as Manager of KHW.  A copy of the said Notice of Removal is annexed hereto and labeled Exhibit "2".

11.   On July 16, 2019, Kaminetzky responded by sending a demand for arbitration (Exhibit "3" annexed hereto) to me pursuant to the Operating Agreement, stating as follows:

> Per our Operating Agreement #17, any and all controversy in any way relating to or arising under or resulting from this agreement shall, in accord with Jewish law be submitted for arbitration to Beis Hora'ah Eitz Chaim in Brooklyn NY under the leadership of Harav Chaim Kohn.

12.   On July 24, 2019, the Rabbinical Court designated by Kaminetzky issued a formal invitation to me, stating: "[a]s per your request for a formal invitation to adjudicate at our beis din,[3]  Mr. Kaminetzky is requesting a Din Torah[4] to discuss the management and ownership of the company called Kamin Health Williamsburg LLC and its operating agreement."  A copy of the arbitration invitation is annexed hereto and labeled Exhibit "4".  On July 29, 2019, I (through counsel) accepted the invitation to arbitrate before the *Beis Din* designated by Kaminetzky.  A copy of that acceptance is annexed hereto and labeled Exhibit "5".

13.   We subsequently signed and delivered a separate arbitration agreement (dated July 23, 2019, the date that Kaminetzky requested the *Beth Din* to commence the *din torah*) agreeing to arbitrate before Rabbi Kohn, the leader of the panel designated in the Operating Agreement of

---

[3]   A "beis din" is a Jewish Rabbinical Court viewed under New York law as a recognized arbitration panel.

[4]   A "din Torah" is a formal hearing before a Jewish Court; the procedure of a *din Torah* is recognized under New York law as a valid arbitration proceeding.

KHW.  A copy of the fully executed arbitration agreement is annexed hereto and labeled Exhibit "6".

14.    Thereafter, and for the next approximate two months, Kaminetzky and UCM continuously refused to abide by numerous dates scheduled by the *Beis Din*.  Finally, in early September, I requested permission from the *Beis Din* to file a motion for injunctive relief before a secular Court.  On September 16, 2019, the *Beis Din* sent an e-mail to the parties stating, in relevant part, that:

> Mr. Kaminetzky and Counsel,
>
> This matter has been delayed continuously since late July. Although the other party requested permission to place an injunction in court, the beis din did not grant this until now in order to give Mr. Kaminetzky opportunity to represent himself. However, if a date no later than the last week of October/Early Cheshvan cannot be confirmed by this Wednesday, beis din will be forced to consider the Halperin's request.

15.  A copy of that notice from the *Beis Din* is annexed hereto and labeled Exhibit "7". Kaminetzky continued to refuse to abide by the *Beis Din*'s scheduling orders, and the *Beis Din* issued a notice to the parties on September 18, 2019, granting permission to PHL to "file an injunction in court on the aforementioned funds ["all funds that are related to Kamin Health Williamsburg LLC"] for the pendency of this din Torah."  A copy of the said notice is annexed hereto and labeled Exhibit "8".

16.  Two days later, on September 20, 2019, the *Beis Din* itself issued a formal "Award and Order granting Injunctive Relief."  A copy of the same is annexed hereto and labeled Exhibit "9".  The same provided, in relevant part, as follows (non-italicized emphasis in original):

> **ORDERED** that, for the pendency of this *din Torah*, all funds received by any agent of Kamin Health Williamsburg LLC must be deposited only into the operating account of Kamin Health Williamsburg LLC and not comingled with funds belonging to any other entity, and such funds shall be used only for the business purposes of Kamin Health Williamsburg LLC.  Yitzchak Kaminetzky and

all persons operating through him or at his request or instruction, are hereby restrained and enjoined, during the pendency of this *din Torah* from disobeying this provision, or diverting funds, or using funds for any purpose other than the business purposes of Kamin Health Williamsburg LLC, and *all checks shall be issued and signed only by the bookkeeper for Kamin Health Williamsburg LLC*,[5] and it is further

    **ORDERED** that this Decision and Order is intended to be an Interim Order on the issues of the use and disposition by the parties of funds belonging to Kamin Health Williamsburg LLC during the pendency of this din Torah, such that the same may be confirmed by any court of competent jurisdiction pursuant the provisions of New York Law, and the parties (or either of them) are granted permission to immediately petition such court for such confirmation, or alternatively, to petition for injunctive relief in aid of arbitration consistent with the relief granted in this Order.

17.   Despite the ruling and Award of the *Beis Din*, Kaminetzky and UCM continue to divert funds from KHW and continued to write checks signed by persons other than the bookkeeper for KHW.  Consequently, on September 27, 2019, PHL presented to the New York State Supreme Court, Kings County, an Order to Show Cause under Index No. 521021/2019 [the "Injunction Action"] seeking a preliminary injunction in aid of arbitration to prohibit the diversion of KHW funds by Kaminetzky.  The State Court [Hon. Ken Sherman] issued the said Order to Show Cause in the Injunction Action, and simultaneously issued a Temporary Restraining Order which provided that:

    Respondents U C Management LLC and Yitzchak Kaminetzky, and all persons operating through either of them or at their request or instruction, are hereby temporarily restrained from (i) diverting, dissipating or using any funds of Kamin Health for any purposes other than the business purposes of Kamin Health; (ii) depositing any funds of Kamin Health into any account other than the TD Bank operating account of Kamin Health ending in 4683, and (iii) writing or issuing any checks other than checks issued by Blini Gold, the bookkeeper of Kamin Health.

18.   A copy of that TRO is annexed hereto and labeled Exhibit "10".  On December 6, 2019, the State Court [Hon. Wavny Toussaint] issued a Preliminary Injunction Order in the Injunction Action which was entered on December 10, 2019 (the "Preliminary Injunction").  A

---

[5]  The bookkeeper for KHW was (and remains) Blini Gold.

copy of the same is annexed hereto and labeled Exhibit "11".[6]   On December 14, 2019, a copy of the Preliminary Injunction with notice of entry was served on Kaminetzky's and UCM's counsel –who is, of course, also counsel for the Plaintiff in the within action – as well as on Kaminetzky and UCM directly.  A copy of the Notice of Entry with Affirmation of Service of the same, together with the Post Office proof of delivery, is annexed hereto and collectively labeled Exhibit "12".

19.    Thereafter, Kaminetzky and UCM completely ignored both Judge Sherman's September 27, 2019 TRO, and Judge Toussaint's December 6, 2019 Preliminary Injunction Order, diverting many hundreds of thousands of dollars of KHW funds from the bank account that the Courts specifically directed the same be deposited into, and disbursing those funds without KHW's designated bookkeeper, Blini Gold, issuing checks or authorizing the same.

20.    Consequently, PHL brought a motion in the Injunction Action on May 15, 2020, seeking to hold Kaminetzky, UCM and all those acting in concert with them in contempt of Court. Even after the filing of that motion, Kaminetzky and UCM continued to ignore the Court's Preliminary Injunction Order and continued to divert funds from the bank account that the Court directed the same to be deposited into.

21.    On July 15, 2020, Judge Toussaint issued an order granting the contempt motion "to the extent of setting the matter down for a hearing on October 1, 2020 …"  A copy of the same is annexed hereto and labeled Exhibit "13".  That hearing date was thereafter adjourned as a result

---

[6]  As can be seen, the Preliminary Injunction provided, *inter alia*, that "all funds received by any agent of Kamin Health Williamsburg LLC must be deposited only into the TD Bank operating account of Kamin Health Williamsburg LLC ending in 4683, and (ii) any checks of Kamin Health Williamsburg LLC shall be issued and signed only by Blini Gold, the bookkeeper for Kamin Health, and Respondents, and all other persons knowingly acting or operating through any of them and receiving notice of this Order, are hereby enjoined from issuing any such checks."

of the COVID-19 restrictions on live hearings and the Court has indicated that it will be rescheduled as soon as the live hearings restrictions are lifted.

II. ***The Purported "Assignment" by Kaminetzky in Violation of the Preliminary Injunction Order and the Operating Agreement***

22.    Notwithstanding that (i) the State Court's Injunction Order was in place and unambiguously prohibited funds belonging to KHW be deposited anywhere other than in KHW's TD operating account and disbursed only at the direction of Blini Gold, (ii) the Operating Agreement of KHW prohibited any disposition of the assets of KHW other than in the ordinary course of business,[7]  (iii) Kaminetzky had been ousted as manager of KHW months earlier, and (iv) the issue of the management and ownership of KHW (and, thus, Kaminetzky's ability to act on behalf of that entity) were already before an arbitration panel (*Beis Din*) for disposition, which panel had *already* enjoined the depositing of any funds other than in KHW's TD operating account and disbursed only at the direction of Blini Gold, on October 23, 2019 Kaminetzky (incredibly,

---

[7]  The Operating Agreement [Exhibit 1] provided (at Article 7) that (emphasis added):

> Notwithstanding the above, the consent of the Members holding at least sixty-six (66%) of the Membership Interest shall be required with respect to all decisions affecting the substantive Business affairs and/or operations of the LLC, such as, sale of the assets of the LLC out of the ordinary course of business; obtaining financing; changing or adding to the principal place of business of the LLC; addition of new members; designation of the LLC bank accounts; designation of the LLC's accountants and the like.

Clearly, an assignment of all of the assets of KHW (i) affects the business affairs and operations of the LLC, and (ii) constitutes a sale of the assets outside of the ordinary course of business. As such, there is absolutely no question that doing the same required the consent of both Kaminetzky and Halperin.

In his papers, Pick admitted that he was aware of this Court's Preliminary Injunction but, nonetheless, ignored the same.  A separate motion to hold Pick in contempt of court for his intentional violation of that Order is being separately filed.

while facing a hearing on a contempt motion already), signed a purported "assignment" of all of the funds and assets of KHW to one Douglas Pick ("Pick").  A copy of the purported Assignment is annexed hereto and labeled Exhibit "14".

23.   The purported Assignment, in direct violation of the State Court's Preliminary Injunction Order, permitted Pick to received KHW funds in his own account and "sign the name of [KHW] to any check" which is payable to KHW, to "collect" all funds belonging to KHW, to "hold" the funds of KHW (bypassing the KHW TD Bank operating account), and to pay himself and others from those funds (bypassing the requirement for Blini Gold's signature).

24.   On December 22, 2020, the arbitration panel issued a supplemental Award and Order. In that Award and Order, the arbitration panel *specifically* ruled on the issue of Pick's authority to act ***and determined that Kaminetzky did not have the authority to assign KHW assets to Pick and directed him to revoke the purported "assignment" documents***.  A copy of that decision and Order of the arbitration panel is annexed hereto and labeled Exhibit "15".  As can be seen, the same reads verbatim as follows (emphasis added):[8]

AWARD AND ORDER BY RABBI CHAIM KOHN:

Dear Mr. Kaminetzky:

Mr. Halperin has submitted to us a document that you signed supposedly assigning the assets of Kamin Health of Williamsburg to another person.  As you know, the disposition of the assets of Kamin Health of Williamsburg, and your authority to act on behalf of that company, is a matter directly before us in this *din Torah*.  As you also know this Rabbinical Court previously issued a *psak* enjoining you from "diverting" funds of Kamin Health of Williamsburg to any place other than the operating bank account at TD Bank, and being paid out by anyone other than the company's bookkeeper, Blini Gold.  Therefore, ***we reiterate that you may not, until this din Torah is over, sign any document which assigns the assets of Kamin Health Williamsburg to any trustee or permits any person other than the***

---

[8]  The December 22, 2020 Award and Order refers to the prior "*psak*" of the arbitration panel (the *Beth Din*).  The decision of a *Beth Din* is known as a "*psak din*" or "*psak halakha*" ("ruling of law") or simply a "*psak*."  In Hebrew, the *psak* implies a finalization of the process of legal debate.

*company's bookkeeper to transfer of any assets of Kamin Health of Williamsburg.  You are directed to immediately withdraw and revoke the assignment document and continue to make sure that any funds of Kamin Health of Williamsburg are dealt with strictly in accordance with our prior psak.*

25.  Thus, as of this point, there has been a *specific* and *definitive* ruling by the arbitration panel that Kaminetzky was *not* authorized to execute any assignment of KHW's assets, a direction that he immediately withdraw and revoke any such assignment, and that all funds of KHW *must* be deposited only into the KHW TD Bank operating account until the conclusion of the arbitration proceeding.  Despite the arbitration ruling *requiring* Kaminetzky to return the funds he diverted to the KHW operating agreement, he *still* refuses to do so.

26.  As of this date, between the funds Kaminetzky diverted to an account under his control and the additional funds that he has now diverted to Pick, there has been at least $759,884.81 that Kaminetzky has diverted in violation of (i) the Operating Agreement, (ii) two separate awards of the arbitration panel, (iii) the TRO issued by the State Court, and (iv) the Preliminary Injunction issued by the State Court.

## II. ___Kaminetzky's Other Prior Ultra Vires and Illegal Actions___

27.  In October of 2019, Kaminetzky *ex parte* advised all employees of KHW (on a Thursday) that they were all fired as of the following day, Friday.  Kaminetzky had no authority to do so and did so without my knowledge or consent.  Since I owned (through another corporation of mine) the building that KHW was operating out of, and since I had invested in excess of $600,000 into KHW (Kaminetzky did not invest one penny), the abrupt purported "termination" of the employees was unquestionably intended to harm me financially in the severest possible manner.  I would have a building without a tenant, and (if Kaminetzky was successful in stopping the busines from operating), I would lose my very large investment.

28.  Since Kaminetzky had been discharged as manager many months earlier, and since Kaminetzky had personally abandoned the business, my main emphasis when that happened was on attempting to locate a tenant for my building as fast as possible who would operate an urgent care business therein.  I have sent a significant amount of money building out that facility for that specific purpose and to accommodate that specific business.  I could only devote my attention to attempting to locate such a tenant and then seek to hold Kaminetzky responsible in our pending arbitration for the damages he caused to me as a result of his unauthorized, *ultra vires* and retaliatory actions.

29.  Based on Kaminetzky's unauthorized and abrupt "firing" of all of KHW's employees, I could not simply hire new employees quickly enough to resurrect the business on my own. However, I was able, fortunately, to locate a new tenant for my building that was willing to enter into an immediate lease and commence *its own* urgent care operations.  The new tenant, however, had no interest whatsoever in using the Kamin Health name or, in any manner, being affiliated with Kamin Health because, frankly, the Kamin Health reputation in the industry is terrible.

30.  The new tenant began its operations in the building in around mid-November of 2020. The focus, however, was on them setting up and commencing the operations, and then having new signage and written materials prepared.  That was, as the Court is aware, smack in the midst of the start of the second wave of the COVID-19 pandemic, and testing activities at the site, as the Court can well imagine, were quite hectic.

31.  On November 13, 2020, in the midst of all of the chaos that Kaminetzky and the virus had created, I was advised by my attorney that he had received a letter from Kaminetzky's attorney (who claimed to be writing on behalf of an entity I have never heard of, "Kamin Health LLC"). which claimed that that entity owned the "Kamin Health name and brand."  That was, of course,

completely contrary to Kaminetzky's representation in the KHW Operating Agreement that Kaminetzky's other company, UCM was "licensing" the Kamin Health name to KHW.

32.   Thereafter, when my attorney could not find any registered trademark for Kamin Health in the name of Mr. Polock's "client" (or anyone else for that matter) my attorney requested that Mr. Pollock disclose the USPTO registration numbers for any alleged trademarks so that we could ascertain (i) exactly what the same were claimed to be and (ii) who the owners of the same were.   That information was not forthcoming.   We now know that that is because there is no registered trademark *at all* in the name of Kamin Health LLC.   Nor is there any registered trademark *in anyone's name* for the words "Kamin Health," nor for any logo allegedly associated with that term.

33.   In any event, and particularly because the new tenant did not wish to be associated with the "Kamin" name, I set about taking the steps necessary to remove the Kamin name from all of the signage.   Because, primarily, of the difficulty in obtaining a non-essential contractor to do any work I the midst of the pandemic, that was not a task that we could make quickly happen. Eventually, we located a contractor that would remove the Kamin Health name from the outside of the building.   The signage, as of the date that Kaminetzky illegally fired all employees, abandoned the business, and left me holding a more than $600,000.00 bag of air in place of my vanished money, the exterior of the building looked like this:



34.  Focusing in on the actual business sign, it looked like this:



35.  Note the Kamin Health name is clearly visible on the sign.  After we removed the

Kamin Health name, and part of the red cross symbol, it looked like this:



III. ***The Instant Motion for Interlocutory Relief***

36.  Indeed, when Plaintiff brought the instant injunction motion, it was perfectly well aware that the Kamin Health name had been entirely removed from the exterior sign on the building because it submitted, as Exhibit 1 to the Declaration of Ari Efron the picture above showing the name removed.

37.  By the middle of December, the abandoned signage and materials on the interior of the premises were either removed or covered up by the tenant as well, as depicted below:

On December 17, 2020:                          Post December 17, 2020:

   

On December 17, 2020:                    Post December 17, 2020:









38.  While I do not believe that either I or the tenant was *required* to remove the Kamin Health name given the existence of the Operating Agreement license, neither the tenant nor I wished to be associated with the Kamin name in any event and, as a result, I caused the exterior references in the building to the Kamin name to be removed, and the tenant removed all interior references to the same.

39.  Therefore, at the time that Plaintiff brought its instant motion, the same was already moot.

40.  Plaintiff's attempt to overcome that fact takes the apparent path of claiming that the stylized cross symbol that appeared on the exterior of the building somehow constituted a "trademark."  But the medical cross logo (first used by the Red Cross decades ago) is the age-old symbol of *every* health care facility:

41.  The symbol, in various forms, usually with the name of the facility owner or manager included, is used in virtually *every* health care facility (urgent care or otherwise) in the world.  For example, here are just some of examples of the variables used in the United States alone:



42.  The cross symbol that Plaintiff claims it uses is just another variation on the cross theme:  Plaintiff has presented no evidence whatsoever to this Court that that symbol (separate and apart from the "Kamin" name affixed thereto) has acquired any kind of secondary meaning.  Moreover, on the outside of the building, I had the sign people take down two vertical arrows that were included in the symbol so that there could not be any argument (however frivolous) that the symbol somehow connotes Kamin Health.  What I left up (until I can entirely

replace the existing red cross symbol with another stylized version of the symbol (in whatever form the tenant eventually requests) is as follows:



43.  Note the removal of the vertical "arrows" to make the symbol more closely resemble an actual red cross.

44.  I can advise the Court from my personal experience with KHW that people do *not* go to urgent care facilities because of who operates them, they go to the one closest to their home (or wherever they are when the need arises) because they require *urgent* care.  At the time of the events giving rise to this action, the closest urgent care facility to the one in my building was approximately ten blocks away.  Ten blocks in Williamsburg (indeed, virtually *anywhere* in Brooklyn), is like being on another planet or, at least, clearly in another neighborhood.  Unless two competing facilities are fairly close to each other, *proximity*, not management or brand name, is what matters in the urgent care field.

45.  Indeed, the single piece of anecdotal evidence that Plaintiff presents in an attempt to establish "confusion" is, in fact, evidence that the only thing that patients notice is the *name* on the door, and not the manner in which the traditional red cross symbol is stylized.  In the text message reproduced at ¶ 18 of Kaminetzky's Declaration (from an unidentified person who assumedly somehow was aware of Kaminetzky's cell phone number for texting purposes), the (what Kaminetzky calls) "customer" establishes two facts.  First, he or she stated that "I had to get tested quickly so I could have a coaching in person, so I went to the Kamin in Williamsburg."  That is precisely what I personally know to be the case (as I described above) for almost every patent –

he or she is in need of "quick" treatment and goes to the closest urgent care facility available. Secondly, the "customer," responding to Kaminetzky's statement that "we closed that location," asserted: "It said Kamin on the sign!"  The "customer" did not say, "it it had your stylized red cross on the building," rather that the Kamin *name* was visible there.  And that is the point – it is the name, *not* the configuration of the stylized red cross, from which potential patents identify the supplier of the urgent care services.  I have eliminated every reference to the name "Kamin" on the exterior of the building, and the tenant has done the same with respect to the interior of the rented space.

46.  Finally, other than the conclusory Declaration of Kaminetzky, alleging that "Kamin Health LLC has continually invested in its reputation through various advertising campaigns" and that "[w]e have likely invested hundreds of thousands of dollars in branding and advertising," there is not an iota of proof of any such expenditure, let alone any successful in creating secondary meaning. There is simply nothing whatsoever from which the Court could possibly conclude that the stylized red cross symbol – without the Kamin name appearing thereupon – has acquired any secondary meaning or has become associated in the mind of the public with Kamin Health.

47.  Indeed, since the new tenant started to occupy my building, I have been getting reports that patients are expressing relief at the fact that the urgent care facility is under new ownership; and I can see that foot traffic has picked up since the Kamin Health name was removed from the exterior of the building.  Perhaps that is because the new tenant treats people who enter as "patients" need of medical assistance, and not as "customers."

48.  In short, Plaintiff has not come anywhere near the showing necessary to establish either that a likelihood of success on the merits or, more importantly, potential irreparable injury.  Its

motion for injunctive and the interlocutory relief must, it is respectfully submitted, be denied in its entirety for that reason.

49.   Additionally, as set forth above, Kaminetzky does not come before this Court with clean hands.  He has diverted over $750,000 in funds from KHW that were required by two separate State Court Orders, and two separate arbitration awards to be deposited into KHW's bank account, he is facing a contempt hearing for that conduct, he has *ex parte* and without authority purportedly "assigned away" all of KHW's remaining assets, and he has *ex parte* "fired" all of KHW's employees on one day's notice to them and zero days' notice to me – an *ultra vires* act that has left me with no manner of recovering my investment other than proceeding against Kaminetzky personally.

50.   Kaminetzky certainly does not have the clean hands necessary to seek equitable relief from this Court.  For that reason as well, Plaintiff's instant motion for interlocutory relief must, it is respectfully submitted, be denied.

IV.   ***The Instant Motion for Interlocutory Relief***

51.   As set forth above, the issue of the propriety of the use of what Plaintiff claims to be its "trademark" is a matter that falls squarely within the Operating Agreement of KHW.  Not only does that Operating Agreement provide for the license to use the purported trademark, it also provides the duration of the license (perpetual as long as Kaminetzky remains a member of KHW), and the specific method of resolving any disputes (arbitration).

52.   The supposed "trademark" dispute (which is really a dispute at all, but rather just a manner in which Kaminetzky thinks he can exert some pressure on me so that I will back off of the pending contempt motion is State Court and overlook his diversion of in excess of $750,000.00

in violation of two court orders) goes directly to the very subject matter of the Operating Agreement and must be arbitrated.

53.   Indeed, as set forth above, Kaminetzky has already commenced an arbitration against me, the arbitration panel has already issued two interim awards, and we are contesting every aspect of our relationship and our actions.  To the extent that Kaminetzky has any claim regarding my supposed improper use of his purported "trademark," it is in the existing arbitration proceeding that that must be resolved.

54.   Indeed, four days after Kaminetzky was ousted as manager of KHW, he initiated an arbitration proceeding by sending a demand for arbitration (Exhibit 3) to me which cited the arbitration provision in KHW's Operating Agreement and correctly asserted that "any and all controversy in any way relating to or arising under or resulting from this [KHW Operating] agreement shall, in accord with Jewish law be submitted for arbitration to Beis Hora'ah Eitz Chaim in Brooklyn NY under the leadership of Harav Chaim Kohn."  The *Beis Din*'s subsequent invitation to me stated that the arbitration controversy was "the management and ownership of the company called Kamin Health Williamsburg LLC *and its operating agreement*" (Exhibit 4, emphasis added).

55.   In the separate arbitration agreement that Kamenetzky and I thereafter executed (which was dated July 23, 2019) to proceed before the designated *Beis Din*, the broad scope of the subject matter of the arbitration was described (in Kaminetzky's handwriting) as "The management and ownership of the Company called Kamin Health Williamsburg LLC *and its operating agreement*" (Exhibit 6, emphasis added).

56.   The licensing rights to what Kaminetzky claims to be his trademark stem directly and *only* from the Operating Agreement that he signed on behalf of the entity he claimed owned and

could license trademark, the use of the trademark and the duration of the license is controlled directly by the Operating Agreement, and the parties respective rights and obligations under the Operating Agreement (necessarily including the trademark licensing provision) are the direct subject matter of the pending arbitration.

57.   Therefore, the determination of whether there has been any improper use of the purported trademark is (and must be) the subject matter of the pending arbitration.

58.   Consequently, the instant action should be dismissed (or, at least, held in abeyance) pending a determination by the arbitration panel of all of the rights and obligations of the parties, including the use of the purported trademark.

59.   I declare under the penalty of perjury that the foregoing is true and correct.

**WHEREFORE**, it is respectfully requested that this Court deny Plaintiff's motion for interlocutory relief in all respects, grant Defendants' cross-motion to compel arbitration and dismiss (or hold in abeyance) this action pending the final arbitration determination, and award to Defendants such other, further and different relief as may be just, proper and equitable.

Dated: January 20, 2021

_____

Pinchas Halperin