**Michael Levine (ml5153)**
**Levine & Associates, P.C.**
15 Barclay Road
Scarsdale, NY  10583
Telephone (914) 600-4288
Facsimile   (914) 725-4778
Cell Phone (917) 855-6453
Email: ml@LevLaw.org

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| KAMIN HEALTH LLC, | : | **Docket No. 20 Civ 5574** |
| **Plaintiff,** | : | |
| - against - | : | |
| PINCHAS HALPERIN and PINCHAS HALPERIN LLC, | : | |
| **Defendants.** | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION
## FOR INTERLOCUTORY RELIEF AND IN SUPPORT
## OF DEFENDANTS' CROSS-MOTION TO COMPEL
## <u>ARBITRATION AND DISMISS ACTION</u>

**LEVINE & ASSOCIATES, P.C.**
15 Barclay Road
Scarsdale, NY  10583
Telephone (914) 600-4288

# TABLE OF CONTENTS

**Page**

Table of Authorities     iii

Preliminary Statement     1

Statement of Facts     1

Argument     1

POINT I

ARBITRATION IS REQUIRED PURSUANT
TO AN ARBITRATION PROVISION IN A WRITTEN
AGREEMENT WHEREIN THE LICENSE TO USE
THE PURPORTED TRADEMARK AT
ISSUE WAS GRANTED     1

    A.  Estoppel     5
    B.  Agency     8
    C.  The Scope of the Arbitration provision     10
    D.  D.  Staying the Instant Action as an Alternative to Dismissal     11

POINT II

THE INTERLOCUTORY RELIEF REQUESTED
BY PLAINTIFF SHOULD BE DENIED     12

    A.  Plaintiff has Failed to Demonstrate a Likelihood of Irreparable Harm     14
    B.  Plaintiff has Failed to Demonstrate a Likelihood of Success on the Merits     14

       (1) Inherent Distinctiveness     15
       (2) Secondary Meaning     16

    C.  Even if Sufficiently Serious Questions Going to the Merits Exist,
       Plaintiff has Failed to Demonstrate a Balance of Hardships Tipping
       Decidedly in its Favor

Conclusion     18

# TABLE OF AUTHORITIES

**Page**

*Judicial Authority*

*A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318 (2d Cir. 1974)   8

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)   15

*Am. Bureau of Shipping v. Tencara Shipyard S.p.A.*, 170 F.3d 349 (2d Cir. 1999)   5

*Andrews v. Kneeland*, 6 Cow. 354, 357, 1826 N.Y. LEXIS 86, *6 (Sup. Ct. of Judicature 1826)   9

*C.L.A.S.S. Promotions v. D.S. Magazines, Inc.*, 753 F.2d 14 (1985)   15

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655 (2d Cir. 1997)   10

*Centaur Communications v. A/S/M Communications*, 830 F.2d 1217 (2d Cir. 1987)   16,17

*Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289 (2d Cir. 1999)   3

*Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620 (2d Cir. 1989)   8

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010)   13

*Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16 (2d Cir. 1995)   10

*CPR and CPR (USA) Inc., v. Spray*, 1998 U.S. Dist. LEXIS 8058, 1998 WL 283285 (S.D.N.Y. 1998)   11

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245 (2d Cir. 1991)   10

*Dean Witter Reynolds Inc v. Byrd*, 470 U.S. 213, 84 L. Ed. 2d 158, 105 S. Ct. 1238 (1985)   12

*Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 84 L. Ed. 2d 158, 105 S. Ct. 1238 (1985)   2

*Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39 (2d Cir. 1994)   15

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993)   5,8

*E.G. L. Gem Lab Ltd. v. Gem Quality Inst. Inc.*, 1998 U.S. Dist. LEXIS 8678, No. 97 Civ. 7102 1998 WL 314767, at *3 (S.D.N.Y. June 15, 1998)   7

*E.G. L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.*, 1998 U.S. Dist. LEXIS 8678, No. 97-7102, 1998 WL 314767 (S.D.N.Y. Jun. 15, 1998)   12

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009)   14

*Fisser v. International Bank*, 282 F.2d 231 (2d Cir. 1960)   8

*Fluor Daniel Intercontinental, Inc. v. General Electric Co.*, 1999 U.S. Dist. LEXIS 12983 No. 98 Civ. 7181, 1999 WL 637236   6,7

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840 (2d Cir. 1987)   2

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840 (2d Cir. 1987)   1,2

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007)   13

**TABLE OF AUTHORITIES (Continued)**

Page

*Judicial Authority (Continued)*

*Hanson Tr. PLCv. ML SCM Acquisition, Inc.*, 781 F.2d 264 (2d Cir. 1986)  13

*Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir. 1981)  17

*Hartford Accident and Indemnity Co. v. Swiss Reinsurance America Corp.*, 246 F.3d 219
(2d Cir. 2001)  10

*In re Home Ins. Co.*, 908 F. Supp. 180 (S.D.N.Y. 1995)  10

*Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4 (2d Cir. 1981)  8

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988)  6,11

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979)  13

*Keystone Shipping Co. v. Texport Oil Co.*, 782 F. Supp. 28 (S.D.N.Y. 1992)  8

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218 (2d Cir. 2001)  11

*McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825 (2d Cir. 1988)  11

*McMahan Secs. Co. L.P. v. Forum Capital Mkts., L.P.*, 35 F.3d 82 (2d Cir. 1994)  12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 87 L. Ed. 2d
444, 105 S. Ct. 3346 (1985)  1

*Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028 (IMF), 2018 U.S. Dist. LEXIS
75312, 2018 WL 2089342 (S.D.N.Y. May 3, 2018)  14

*Moore v. Consol. Edison Co.*, 409 F.3d 506 (2d Cir. 2005)  13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 74 L. Ed. 2d 765,
103 S. Ct. 927 (1983)  1

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 74 L. Ed. 2d 765,
103 S. Ct. 927 (1983)  10

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1
74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)  1

*Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198 (S.D.N.Y. 2000)  2

*Norcom Elecs.Corp. v. CIM USA, Inc.*, 104 F. Supp. 2d 198 (S.D.N.Y. 2000)  7

*Oldroyd v. Elmira Savings Bank, FSB*, 134 F.3d 72 (2d Cir. 1998)  1,11

*Orient Mid-East Lines v. Albert E. Bowen, Inc.*, 458 F.2d 572 (2d Cir. 1972)  9

*Perry v. Thomas*, 482 U.S. 483, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987)  2

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)  15,16

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 18 L. Ed. 2d 1270
87 S. Ct. 1801 (1967)  2

## TABLE OF AUTHORITIES (Continued)

**Page**

### *Judicial Authority (Continued)*

*Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir. 1976)     17

*Smith/Enron Cogenmeraton Ltd. P'ship v. Smith Cogeneratrion Int'l, Inc.,* 198 F.3d 88 (2d Cir. 1999)     5

*St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 687 F. Supp. 820 (S.D.N.Y. 1988), aff'd 895 F.2d 1410 (2d Cir. 1989)     9

*Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753 (11th Cir. 1993)     6,7

*Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208 (2d Cir. 1985)     16

*Thomson-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773 (2d Cir. 1995)     4,6

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 503 U.S. 957, 112 S. Ct. 1555, 118 L. Ed. 2d 205 (1992)     14

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960)     4

*Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7*, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)     13

*Worldcrisa Corp. v. Armstrong*, 129 F.3d 71 (2d Cir. 1997)     11


### *Legislative Authority*

9 U.S. Code § 3     12
9 U.S. Code §§ 1-14     1
Gen. Bus. Law § 368(d)     14


### *Authoritative Texts*

2 Restatement of Agency (Second) § 321     9
R. Shimon ben Tzemach Duran (1361-1444), *Shu"t Tasshbetz* II, no. 290     9
R. David ibn Zimra (1479-1573), *Teshuvot Radvaz* I, no. 172     9
Rambam, *Mishneh Torah, Hilchot Sanhedrin* 26:7     9
Rashi, commentary to Exodus 21:1     9
*Shulchan Aruch, Chosen Mishpat*, 26:1     9


### *Internet Cites*

http://bethdin.org/wp-content/uploads/2015/07/LaymansGuide.pdf     13

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in opposition to the Plaintiff's motion for interlocutory relief and in support of Defendants' cross-motion to compel arbitration and dismiss (or stay) the instant action.

## STATEMENT OF FACTS

The facts relevant to the instant motion and cross-motion are set forth in the accompanying Declaration of Pinchas Halperin and the Court's attention is respectfully referred thereto in advance of considering this Memorandum.

## ARGUMENT

### POINT I

**ARBITRATION IS REQUIRED PURSUANT TO AN ARBITRATION PROVISION IN A WRITTEN AGREEMENT WHEREIN THE LICENSE TO USE THE PURPORTED TRADEMARK AT ISSUE WAS GRANTED**

In enacting 9 U.S. Code §§ 1-14, the Federal Arbitration Act ("FAA" or the "Act"), Congress created national substantive law governing all questions of the validity and enforceability of arbitration agreements within its scope. *See Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845 (2d Cir. 1987) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985)); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983). The FAA creates a "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983); *see also Oldroyd v. Elmira Savings Bank,*

*FSB*, 134 F.3d 72, 75 (2d Cir. 1998).  Hence, whether a party is bound to arbitrate its claims against another party on the basis of an arbitration clause is a matter of federal law, which incorporates generally accepted principles of contract law.  *See Genesco*, *supra*, 815 F.2d at 845 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404-05, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967)).

The FAA provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable," which reflects the strong federal policy favoring rigorous enforcement of arbitration agreements.  9 U.S.C. § 2; *see Perry v. Thomas*, 482 U.S. 483, 490, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987).  The Act "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed," (*Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 84 L. Ed. 2d 158, 105 S. Ct. 1238 [1985]), and to stay proceedings while the arbitration is pending. 9 U.S.C. §§ 3, 4.  The factors that courts weigh in determining whether to compel arbitration pursuant to the FAA are: (i) whether the parties agreed to arbitrate; (ii) the scope of the arbitration agreement; (iii) if federal statutory claims are at issue, whether Congress intended those claims to be nonarbitrable; and (iv) whether to stay the balance of the proceedings pending arbitration if some, but not all, of the claims in the action are arbitrable.  *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987); *Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 202 (S.D.N.Y. 2000).

Here, the Operating Agreement of Kamin Health Williamsburg LLC ("KHW") is the document whereby a license was granted to use what Plaintiff now claims is a trademark ("the Licensing Agreement").  [Ex 1].[1]  That agreement was entered into between Defendant Pinchas

---

[1]  References in the form "Ex ___ are to the exhibits annexed to the January 19, 2021 Affirmation of Defendant Pinchas Halperin, being submitted simultaneously herewith.

Halperin LLC (the sole member of which is Defendant Pinchas Halperin) and U C Management

LLC (referred to in the Agreement as "Kamin" and whose sole member is Yitzchak Kaminetzky).

Yitzchak Kaminetzky ("Kaminetzky") is also the sole (or, at least, Managing Member of

Plaintiff).[2]   Specifically, that Agreement provides, at § 8, that:

> Kamin shall contribute the license to the use of the brand name "Kamin Health" by
> the LLC, at no cost, which license shall continue for so long as Kamin owns its
> membership interest in the LLC

The Licensing Agreement was executed by Kaminetzky (at page 17 of the same, both

individually and on behalf of U C Management LLC (the entity defined as "Kamin" in the

agreement and the entity on whose behalf Kaminetzky contributed the "Brand name Kamin

Health").   The same also included a broad arbitration agreement at § 17 which reads, in relevant

part:

> Any and all controversy, claim, dispute, etc./, in any way relating to, arising under
> or resulting from this Agreement shall, in accordance with Jewish law, be
> submitted for arbitration to Bais Hora'ah Etz Chaim in Brooklyn, New York,
> under the leadership of Harav Chaim Kohn or as mutually agreed otherwise
> ("Rabbinical Court") and not to any secular court, tribunal or the like except upon
> written permission of said Rabbinical Court.  The Rabbinical Court may award
> monetary damages or direct specific performance or allow such other remedy as it
> may deem appropriate including the issuance of an "IKEL" and such Rabbinical
> Court's decision/order/award (collectively "Award") shall be final and binding on
> the parties.

It is axiomatic that, in considering whether to compel arbitration of a particular dispute, the

Court must first decide whether the parties agreed to arbitrate.  *See Chelsea Square Textiles, Inc.*

*v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 294 (2d Cir. 1999).  Clearly there is an agreement

to arbitrate between Pinchas Halperin LLC ("PHL") and UC Management LLC ("UCM").

However, on the instant cross-motion, Defendants ask the Court to compel arbitration between

---

[2]    In his Declaration accompanying Plaintiff's motion for interlocutory relief, Kaminetzky
describes himself as the "president and CEO of plaintiff Kamin Health LLC."

PHL and Plaintiff Kamin Health LLC, even though Kamin Health LLC is not a direct signatory to the Licensing Agreement containing the arbitration provision. Therefore, the Court must consider whether to infer an agreement to arbitrate between PHL, a signatory, and nonsignatory Kamin Health LLC.

Arbitration is contractual by nature. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995) (citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960)). Thus, while there is a liberal federal policy favoring arbitration, arbitration agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract. "It does not follow, however, that under the [FAA] an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Id.* (citing *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960)). The Second Circuit has made clear that a nonsignatory may be bound to an arbitration agreement if so dictated by the "ordinary principles of contract and agency." *Id.*; *see* also *Smith/Enron Cogeneration Ltd. Partnership v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999).

The Second Circuit has recognized five theories for binding nonsignatories to arbitration agreements: (i) incorporation by reference; (ii) assumption; (iii) agency; (iv) veil-piercing/alter ego; and (v) estoppel. *See Thomson-CSF*, *supra*, 64 F.3d at 776. Here, Defendants contend that Plaintiff should be obligated to arbitrate its claims against Defendants based on the estoppel and agency theories.

4

*A.* ***Estoppel***

The Second Circuit has recognized two branches of estoppel cases. The first, "more typical" case, "arises when a signatory to an arbitration agreement seeks to bind a non-signatory to it." *Smith/Enron Cogenmeraton Ltd. P'ship v. Smith Cogeneratrion Int'l, Inc.,* 198 F.3d 88, 98 (2d Cir. 1999). Under these circumstances, a "non-signatory may be compelled to arbitrate when it has derived other benefits under the agreement containing the arbitration clause." *Id.* (citing *Am. Bureau of Shipping v. Tencara Shipyard S.p.A.*, 170 F.3d 349, 353 [2d Cir. 1999]). This first branch of the estoppel theory is applicable here because signatory PHL is attempting to compel Plaintiff, a nonsignatory, to arbitrate. Here, Kaminetzky, the President of Plaintiff, clearly had – *and exercised* – Plaintiff's right to grant a license for the use of what Plaintiff now claims to be its trademark, which "trademark" was thereafter *actually* used openly and notoriously for over a year. Indeed, the purported trademark was the *only* "contribution" that Kaminetzky made to KHW and, in exchange for the same, obtained a fifty percent interest in KHW. Plaintiff cannot, on the one hand, accept the benefits of the agreement (i.e., a fifty-percent interest given to its President) while, on the other hand, claiming that it is not bound by the terms of the agreement under which it received such benefit.[3]

---

[3] In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993), a foreign accounting firm received a settlement agreement concerning the use of the trade name "Deloitte" in association with accounting practices. Under the agreement – containing an arbitration clause – local affiliates of the international accounting association Deloitte Haskins & Sells International were entitled to use the trade name "Deloitte" in exchange for compliance with the dictates of the agreement. A Norwegian accounting firm received the agreement, made no objection to the terms of the agreement, and proceeded to utilize the trade name. The Court held that by knowingly exploiting the agreement, the accounting firm was estopped from avoiding arbitration despite having never signed the agreement. See 9 F.3d at 1064 ["Noraudit failed to object to the Agreement when it received it … In addition, Noraudit knowingly accepted the benefits of the Agreement … Thus, Noraudit is estopped from denying its obligation to arbitrate under the 1990 Agreement."].

Moreover, the concepts expressed by the courts under the second branch of the estoppel theory, even though in a factually different setting, are equally applicable here.  Under that second branch, the Second Circuit has "been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."  *Thomson-CSF, supra*, 64 F.3d at 779 (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757-58 (11th Cir. 1993);[4] *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-21 (4th Cir. 1988)).  Here, the dispute regarding trademark rights are inextricably intertwined with the licensing agreement because it is that agreement – and only that agreement – from which the right to use what is claimed to be Plaintiff's trademark springs.

Under the second branch or estoppel theory, in determining whether the claims brought against the nonsignatory are sufficiently related to the underlying agreement in order to compel arbitration, courts examine (i) the relationship of the entities involved, and (ii) the relationship of the alleged wrongs to the obligations and duties under the agreement at issue.  *See Fluor Daniel Intercontinental, Inc. v. General Electric Co.*, 1999 U.S. Dist. LEXIS 12983, No. 98 Civ. 7181, 1999 WL 637236, at *6 (citing *Sunkist, supra*, 10 F.3d at 757-58).  Where courts of this Circuit have compelled a signatory to arbitrate claims brought against a nonsignatory, the parties have been linked by "ordinary principles of contract and agency."  *Thomson-CSF, supra*, 64 F.3d at

---

[4]   In *Sunkist*, a signatory was bound to arbitrate with a nonsignatory because of "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract … [the fact that] the claims were 'intimately founded in and intertwined with the underlying contract obligations.'" 10 F.3d at 757.  Here, the "obligations and duties in the contract" on the part of Plaintiff (even though not a signatory) were to permit the use of its purported trademark "for so long as [UC Management LLC] owns its membership interest in [KHW]."  [Ex 1, §8].

6

780.  Specifically, the signatory was either linked contractually to the nonsignatory and/or the nonsignatory was engaged in a corporate relationship with the other signatory.

Both are the case here.  Here, there is no question that Plaintiff is "linked contractually" to PHL because it allowed its agent to grant a contractual license to KHW (an entity in which PHL was a fifty percent owner) to use its purported trademark, and did so in a contract in which PHL was a party and signatory.  Additionally, Plaintiff and UC Management (the other party to the contract) were engaged in a "corporate relationship" with each other, not only because they had common ownership (Kaminetzky), but also because the UC management (a signatory to the agreement) clearly had *actual* authority to bind Plaintiff to a license agreement with PHL.  They did not only have a "corporate relationship," they were clearly joined at the hip.

Further, the Second Circuit has held that where the claims regarding the nonsignatory clearly arose out of the agreement containing the arbitration clause, arbitration can be compelled. *See*, e.g., *Sunkist*, *supra*, 10 F.3d at 758 [compelling signatory to arbitrate claims against nonsignatory where signatory's rights arose out of contract with nonsignatory's subsidiary containing an arbitration clause]; *Norcom Elecs. Corp. v. CIM USA, Inc.,* 104 F. Supp. 2d 198, 203-04 (S.D.N.Y. 2000) [compelling signatory to arbitrate with nonsignatory subsidiary of the other signatory and the claims were linked to actions under the agreement containing the arbitration clause]; *Fluor Daniel*, *supra*, 1999 WL 637236, at *6-*7 [compelling signatory plaintiff to arbitrate with nonsignatory suppliers where (i) there was a close corporate relationship among all defendants, (ii) suppliers were linked contractually to plaintiff through the signatory prime contractor, and (iii) plaintiff's claims against the suppliers arose out of agreements signed by the prime contractor containing an arbitration clause]; *E.G. L. Gem Lab Ltd. v. Gem Quality Inst. Inc.*, 1998 U.S. Dist. LEXIS 8678, No. 97 Civ. 7102, 1998 WL 314767, at *3 (S.D.N.Y. June 15, 1998)

7

[compelling signatory plaintiff to arbitrate with corporate president of signatory defendant where (i) the president executed the agreement containing the arbitration clause, and (ii) the claims against the president arose directly out of his actions under the agreement in question].

In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, *supra*, 9 F.3d at 1064, a foreign accounting firm received a settlement agreement concerning the use of the trade name "Deloitte" in association with accounting practices. Under the agreement – containing an arbitration clause – local affiliates of the international accounting association Deloitte Haskins & Sells International were entitled to use the trade name "Deloitte" in exchange for compliance with the dictates of the agreement. A Norwegian accounting firm received the agreement, made no objection to the terms of the agreement, and proceeded to utilize the trade name.  The Court held that by knowingly exploiting the agreement, the accounting firm was estopped from avoiding arbitration despite having never signed the agreement. See 9 F.3d at 1064 ("Noraudit failed to object to the Agreement when it received it … In addition, Noraudit knowingly accepted the benefits of the Agreement …. Thus, Noraudit is estopped from denying its obligation to arbitrate under the 1990 Agreement.").

## B. *Agency*

Traditional principles of agency law may bind a nonsignatory to an arbitration agreement. *See Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 6-7 (2d Cir. 1981); *A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974); *Fisser v. International Bank*, 282 F.2d 231, 233-38 (2d Cir. 1960); *Keystone Shipping Co. v. Texport Oil Co.*, 782 F. Supp. 28, 31-32 (S.D.N.Y. 1992).  Simply stated, if an agency relationship is established, the principal is responsible for the agent's acts within the scope of his real or apparent authority. *Citibank, N.A.*

*v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir. 1989).[5]  Under New York law, an agent who enters into an agreement on behalf of an undisclosed or partially disclosed principal is jointly and severally liable *with the principal* for the terms of that contract.  *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 687 F. Supp. 820, 832 (S.D.N.Y. 1988) [addressing undisclosed principal], aff'd 895 F.2d 1410 (2d Cir. 1989); *see also Orient Mid-East Lines v. Albert E. Bowen, Inc.*, 458 F.2d 572, 576 (2d Cir. 1972) [citing Restatement of Agency (Second) § 321 (1958)].

Here, there is no question but that Kaminetzky, as President of Plaintiff, had the ability to bind it to a license agreement, whether Plaintiff's specific identity was disclosed or not.  He *de facto* did so in the Licensing Agreement, the sole document from which the right to use what Plaintiff contends is its "trademark" was derived.  If Kaminetzky was authorized to bind Plaintiff to a licensing agreement, he was also clearly also authorized to bind it to an arbitration provision therein, which he did.[6]

---

[5] That has been the law in New York for almost two centuries, since at least 1826.  See *Andrews v. Kneeland*, 6 Cow. 354, 357, 1826 N.Y. LEXIS 86, *6 (Sup. Ct. of Judicature 1826) ["the principal is bound by the acts of a general agent, provided they are within the scope of his authority."].

[6] The principals of all of the entities involved here are orthodox Jews.  Under their religion, absent permission from a Jewish, they are absolutely precluded from bring a claim in secular court.  *See* R. Shimon ben Tzemach Duran (1361-1444), *Shu"t Tasshbetz* II, no. 290; R. David ibn Zimra (1479-1573), *Teshuvot Radvaz* I, no. 172.  The rationale for such a prohibition is explained by Rashi who writes that one who goes to secular courts "profanes the name of G-d and gives honor to the name of idols."  *See* commentary of Rashi to Exodus 21:1.  Indeed, one who does so is considered as if he has "blasphemed and raised a hand against the Torah of Moses." Rambam, *Mishneh Torah, Hilchot Sanhedrin* 26:7.  That is true even in a situation where the secular court would rule according to Jewish law and in a case where both litigants agree to go to secular courts. *Shulchan Aruch, Chosen Mishpat*, 26:1.  We raise this not for the purpose of having the Court delve into Jewish law, but rather to explain the background of the arbitration provision and its application to any entity that the parties were involved with.

## C. *The Scope of the Arbitration Provision*

Once the Court has determined that a party is bound by an arbitration provision, it must then consider whether the particular disputes sought to be arbitrated "falls within the scope of the arbitration agreement." *Hartford Accident and Indemnity Co. v. Swiss Reinsurance America Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (citation omitted). Whether an agreement to arbitrate governs a particular dispute is essentially a matter of contract interpretation. *See Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) ("Federal arbitration policy respects arbitration agreements as contracts that are enforceable in the same way as any other contract."); *see also In re Home Ins. Co.*, 908 F. Supp. 180, 183 (S.D.N.Y. 1995).

The FAA establishes a liberal policy in favor of arbitration as a means to reduce the costliness and delays of litigation. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997) (Pollack J., by designation). "Federal policy strongly favors arbitration as an alternative dispute resolution process." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir. 1991); *see also Hartford Accident and Indemnity, supra*, 246 F.3d at 226. In accordance with that policy, courts should "construe arbitration clauses as broadly as possible," (*Threlkeld*, 923 F.2d at 250 [internal quotation and citation omitted]), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983); *see also Hartford Accident and Indemnity*, 246 F.3d at 226; Collins, 58 F.3d at 19. Thus, a district court should compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that it covers the asserted dispute." *Threlkeld*, 923 F.2d at 250 (internal quotation and citation omitted).

10

The strong policy in favor of arbitration is even stronger where the arbitration clause itself is a broad clause that refers to arbitration of "all disputes arising out of an agreement." *See McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988); *see* also *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) ["Recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow" and that where an arbitration clause is broad there a presumption of arbitrability arises]; and *CPR and CPR (USA) Inc., v. Spray*, 1998 U.S. Dist. LEXIS 8058, 1998 WL 283285, at *1 (S.D.N.Y. 1998). Here, the arbitration clause in the Agreements covers "any and all controversy, claim, dispute, etc., in any way relating to, arising under or resulting from this Agreement" [whether it is between the named parties to the agreement or otherwise]. The phrase "arising out of, under, or in connection with" is prototypical of a broad arbitration clause. *Oldroyd*, 134 F.3d at 76; *see Worldcrisa Corp. v. Armstrong*, 129 F.3d 71, 75 (2d Cir. 1997).

The existence of such a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome "if it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that it covers the asserted dispute." *Oldroyd*, 134 F.3d at 76. In light of this broad arbitration clause, this Court must apply a strong presumption of arbitrability in determining the scope of the arbitration clause. *Id.*; accord *J.J. Ryan*, 863 F.2d at 317. Here, there is no question that the rights to use a purported trademark that is granted in an agreement containing such a broad arbitration provision is arbitrable.

D. *Staying the Instant Action as an Alternative to Dismissal*

It is urged that this Court should issue an Order compelling arbitration for the reasons discussed above. It is also urged that, in conjunction therewith, the instant action should be

dismissed because the arbitration panel will determine the parties' rights with respect to the purported trademark.  However, if the Court concludes that there may be remaining issues that might come before it notwithstanding the arbitrators' award, then, at the very least, this action should be stayed.

Section 3 of the FAA provides that the court must stay any suit or proceeding until arbitration has been completed if the action concerns "any issue referable to arbitration." 9 U.S.C. § 3; *see McMahan Secs. Co. L.P. v. Forum Capital Mkts., L.P.*, 35 F.3d 82, 85 (2d Cir. 1994); *Dean Witter Reynolds Inc v. Byrd*, 470 U.S. 213, 218, 84 L. Ed. 2d 158, 105 S. Ct. 1238 (1985). The FAA "leaves no place for the exercise of discretion by a district court but instead mandates that district courts shall direct the parties to proceed to arbitration on issues [on] which an arbitration agreement has been signed."  *E.G. L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.*, 1998 U.S. Dist. LEXIS 8678, *6, No. 97-7102, 1998 WL 314767, at *2 (S.D.N.Y. Jun. 15, 1998).

Here, although we do not see any issues that could possibly remain after the arbitration, should the Court disagree with that assessment, it is respectfully requested that this action be stayed pending the conclusion of the arbitration.

## POINT II

### THE INTERLOCUTORY RELIEF REQUESTED
### BY PLAINTIFF SHOULD BE DENIED

Obviously, if this Court grants the motion to compel arbitration (whether it dismisses the instant action nor not), it will be for the arbitrators, and not this Court, to issue any interlocutory relief.  That is especially true where, as here, the arbitration provision specifically grants the

arbitrators the right to "direct specific performance or allow such other remedy as it may deem appropriate including the issuance of an 'IKEL'."[7]

Even if this Court does not compel arbitration, it should still deny Plaintiff's present request for interlocutory relief. In order to obtain a preliminary injunction, the moving party must establish the following: (i) a likelihood of irreparable harm absent preliminary relief; (ii) a likelihood of success on the merits; (iii) the balance of equities tipping in favor of the moving party; and (iv) the public interest is served by an injunction. *See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7*, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). Where the moving party is unable to demonstrate a likelihood of success on the merits, a court may still issue a preliminary injunction if the moving party demonstrates "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Those are the same criteria to be applied in a trademark infringement case. Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000).

"A preliminary injunction is an extraordinary remedy never awarded as of right," (*Winter*, 555 U.S. at 24), and "is one of the most drastic tools in the arsenal of judicial remedies," (*Hanson Tr. PLCv. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (quotation omitted)). "The district court has wide discretion in determining whether to grant a preliminary injunction[.]" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Moore v. Consol. Edison Co.*, 409 F.3d 506, 511 (2d Cir. 2005)).

---

[7] An ikel (or "ikul") is the equivalent of a restraining order in a Jewish arbitration before a *beth din*. See http://bethdin.org/wp-content/uploads/2015/07/LaymansGuide.pdf.

### A.  *Plaintiff has Failed to Demonstrate a Likelihood of Irreparable Harm*

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). "Thus, if a party fails to show irreparable harm, a court need not even address the remaining elements of the test." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028 (IMF), 2018 U.S. Dist. LEXIS 75312, 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018).  While, a presumption of irreparable harm can be made where a plaintiff establishes a likelihood of consumer confusion," there has to be sufficient objective proof of the same in order to support the extraordinary relief sought.  Here, aside from one anecdotal text message from a purported "customer," no such showing has been made.  And even that single text message refers only to the "Kamin Health" name (which was removed some time ago) and not to any stylized symbol.

In short, Plaintiff has not even come close to the showing of irreparable injury that is required to support a preliminary injunction.

### B.  *Plaintiff has Failed to Demonstrate a Likelihood of Success on the Merits*

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for infringement of unregistered service marks.  To succeed on such a claim, the service mark owner must show (a) likelihood that an appreciable number of ordinary, prudent purchasers or prospective purchasers would be misled or confused as to the source, sponsorship, affiliation or approval of the services, and (2) that the service mark is distinctive, either inherently, or by the acquisition of secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 503 U.S. 957, 112 S. Ct. 1555, 118 L. Ed. 2d 205 (1992).  Similarly, an injunction for dilution under N.Y. Gen. Bus. Law § 368(d) requires the plaintiff to show (i) that its mark is distinctive or has acquired secondary

14

meaning, and (ii) there is likelihood of dilution.  *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39 (2d Cir. 1994).  Here, plaintiff is unlikely to succeed on these two claims because it has not established that the stylized "red cross" symbol that it claims to be its trademark by itself (i.e., absent the inclusion of the "Kamin Health" name) is sufficiently distinctive or that it has acquired secondary meaning that would warrant its protection as a service mark.

### (1) Inherent Distinctiveness

There are four categories of marks: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. Generic marks are never considered distinctive.  Descriptive marks are also not inherently distinctive, but may acquire secondary meaning that makes them distinctive. Suggestive marks and arbitrary or fanciful marks are deemed to be inherently distinctive without a showing of secondary meaning.

A suggestive mark is one that "requires imagination, thought and perception to reach a conclusion as to the nature of [its] goods" or services.  *C.L.A.S.S. Promotions v. D.S. Magazines, Inc.*, 753 F.2d 14 (1985) (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

Here, Plaintiff argues that its "name and stylized font" when "used together with the distinctive geometric shape that is its logo, in combination with its signature red-and-white color scheme" renders its unregistered purported service mark worthy of protection.   [Moving Memorandum, p. 8].  In short, Plaintiff argues that what it calls its "trademark" is suggestive.  But that argument is faulty for at least two reasons.  First it presupposes that the "Kamin Health" name is included on its purported "mark."  As is clear from the accompanying Declaration of Pinchas Halperin, the "Kamin" name was entirely removed from all signs on the exterior and interior of the subject building.  Secondly, what Plaintiff refers to as its "logo" is simply a form of a "red

cross" that is us to designate virtually every medical providing facility in the world.  The symbol is simply (absent the "Kamin Healthy" words) not "inherently distinctive."

### (2) Secondary Meaning

Since its "inherent distinctiveness" argument is doomed to failure, Plaintiff also argues that it has established a "likelihood of confusion" under the Polaroid test[8] (*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 [2d Cir. 1961]).  However, that begs the issue because for such confusion to exist – i.e., to establish distinctiveness – Plaintiff must show that its purported "trademark" has acquired "secondary meaning."  It has not even attempted to dop that.

Determining whether a service mark has acquired secondary meaning involves an examination of the following factors: advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product or services, sales success, attempts to plagiarize the mark, length and exclusivity of the mark's use.  *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1222 (2d Cir. 1987).  "No single factor is determinative, and every element need not be proved."  *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985), quoted in *Centaur Communications*, 830 F.2d at 1222.  The Plaintiff, however, has failed to make an evidentiary showing as to *any* of those elements.

Indeed, the only one of the elements that it even pretends to address is the "advertising expenditures" issue.  However, the entirety of that "showing" is the completely unsupported single-sentence assertion in the Declaration of Kaminetzky that "[w]e have likely invested hundreds of thousands of dollars in branding and advertising."  [Kaminetzky Declaration, ¶ 54].

---

[8]  In *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), the Court enunciated an eight-prong test to determine whether a "strong likelihood of confusion" is established. Although plaintiff pays lip service to those prongs, its conclusory statements by counsel that it has established them is completely unsupported by any evidence before this Court.

However, there is not *one iota* of proof offered to corroborate that conclusory statement.  Nor do Plaintiffs explain how its efforts were effective in causing the relevant group of consumers to associate its red cross variant with Kamin Health.  *See Centaur Communications*, 830 F.2d at 1222-23; *see* also McCarthy on Trademarks § 15.19.

Aside from that glaring deficiency in proof, Plaintiff has failed to present any proof of any unsolicited newspaper articles or media coverage where it is mentioned.[9]  Nor has Plaintiff presented any evidence that it has enjoyed "sales success" since it began using what it claims is its trademark, or any attempts to plagiarize that same, or even how long it has used the purported mark.

In short, Plaintiff has failed to establish a likelihood of success on the merits.

### C.  *Even if Sufficiently Serious Questions Going to the Merits Exist, Plaintiff has Failed to Demonstrate a Balance of Hardships Tipping Decidedly in its Favor*

Even assuming, for the purposes of this motion, that a serious question has been presented that goes to the merits of this dispute and makes it a fair ground for litigation, Plaintiff has not established that the balance of the hardships that would result from the Court's denial of the plaintiff's motion for a preliminary injunction tip in its favor.

Plaintiff's general allegations of hardship include customer confusion, dilution of its service mark, and harm to its goodwill and reputation.  However, those assertions presuppose that (i) there will be customer confusion even where the "Kamin Health" name is not depicted on any sign, and

---

[9]  Unsolicited media coverage was considered in *Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir. 1981), to determine whether a romance novel format had acquired secondary meaning.  The unsolicited media coverage in that case described the enthusiasm and loyalty shown by Harlequin's readers, not Harlequin's use of a particular cover format.  *See* also *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1174 (2d Cir. 1976) [Court considered newspaper articles that indicated a recognition of plaintiff as a designer of a particular product].

(ii) the services being rendered by the tenant in the subject building are such that the lack of quality of the same will harm the "goodwill and reputation" of Plaintiff. The problem, with that assertion, however, is that there is no credible evidence of *any* of that. No evidence of any consumer confusion exists (other than a single text message saying that the "Kamin Health" name was on the exterior of the facility, which, according to the photographs offered by Plaintiff, has been removed). Nor has any evidence been presented *at all* establishing any "good will" or favorable "reputation" in either the Kamin Health name or its purported trademark.

On the other hand, requiring Defendants (who are not even the tenant operating the urgent health facility at issue) to (i) determine what conceivably falls within the definition of the purported "Kamin Health Trademarks," go through whatever materials the tenant is using to determine whether any of it is improper, and then engage in a series of physical acts to eliminate materials in the midst of a pandemic, would create an unreasonable hardship on the part of Defendants.

## CONCLUSION

For the reasons set forth herein, and in the Accompanying Declaration of Pinchas Halperin, it is respectfully requested that this Court deny Plaintiff's motion for interlocutory relief in its entirety, and grant in its entirety Defendants' cross-motion to compel arbitration and dismiss (or stay) the instant action.

Dated: January 19, 2021

LEVINE & ASSOCIATES, P.C.

By: _____
       Michael Levine
15 Barclay Road
Scarsdale, NY 10583
Telephone (914) 600-4288
Facsimile (914) 725-4778
e-mail: ml@LevLaw.org
*Attorneys for Defendants*