UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

KAMIN HEALTH LLC,

    Plaintiff,

v.

PINCHAS HALPERIN and PINCHAS HALPERIN LLC,

    Defendants.

---

Case No.: 20 Civ. 5574

**REPLY DECLARATION OF YITZCHOK KAMINETZKY**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I am the president and CEO of plaintiff Kamin Health LLC and I have personal knowledge of all of the facts described below. I submit this declaration in further support of Plaintiff's motion for a preliminary injunction and in opposition to Defendants' motion to compel arbitration.

2. The instant litigation is about Defendants' unauthorized use of Plaintiff's trademarks, and not the business dispute with Mr. Halperin. However, because Mr. Halperin's declaration leaves out key facts, *see* Declaration of Pinchas Halperin, sworn Jan. 19, 2021, ECF no. 20 ("Halperin Dec."), I am submitting this reply declaration to address the main points that require correction. In submitting this declaration, I do not intend to suggest that these facts, except those pertaining to Plaintiff's trademark, have any relevance to the instant proceedings.

**I.      History of the Kamin brand and logo.**



3.      My wife created the red Kamin Health logo in March 2014. She is a professional graphic designer and created the logo when the business opened its first urgent care in Fresh Meadows, Queens. At the time, the business was owned by Precious Care Management LLC, and was not yet called Kamin Health.

4.      The goal was to create a logo that evokes medical care in a distinctive way that customers could associate with quality care, and quickly identify the location as a place where that quality care would be provided.

5.      By September of 2016, the business was expanding to new locations, and we hired a marketing director to assist in those efforts. The decision was made to rebrand all locations as Kamin Health.

6.      As described on the Kamin Health website: "Not viewing this venture as just another group of Urgent Care Centers, they decided to add many elements from their second business in Hospitality and merge almost a century of collective experience into the 'Kāmin Health experience.' … Why are posh and inviting colors and award winning designs reserved only for Resorts and Country Clubs?  Aside from providing the very best in medical equipment together with the most dedicated and caring medical and professional staff, we at Kāmin Health, we have broken these boundaries."  https://www.kaminhealth.com/about-us/

7.      Because the logo was already known and valuable, we continued to use it alongside the Kamin Health name. Importantly, the marketing team made a concerted effort to create brand recognition for both the name and the trade dress. These efforts continue today, as can be seen on the Kamin Health website (https://www.kaminhealth.com/), Instagram

(https://www.instagram.com/kaminhealth/), and Twitter (https://twitter.com/kaminhealth) feeds.

8.  Also as part of the 2016 restructuring, Plaintiff Kamin Health LLC was formed in November 2016, and was assigned ownership of the Kamin Health brand and logo.

9.  Kamin Health LLC is owned by myself and my two brothers. It is not owned solely by me, as Mr. Halperin incorrectly asserts.

## II.  Plaintiff Kamin Health did not agree to be bound by the Williamsburg Operating Agreement's arbitration clause.

10.  Plaintiff has allowed certain affiliated entities to use its trademarked materials at Kamin Health locations. Each of the locations has a different ownership structure and a unique operating agreement.

11.  With respect to the former Williamsburg location, Plaintiff allowed the use of its branded materials by U C Management, an affiliated entity formed on September 12, 2018. Under the Williamsburg operating agreement, U C Management, referred to in that agreement by the defined term "Kamin," agreed to "contribute the license to the use of the brand name 'Kamin Health' by the LLC" at no cost. *See* ECF no. 19-2 ("Op. Agr.") § 8; Declaration of Yitzchok Kaminetzky, sworn Dec. 31, 2020, ECF no. 13-2 ("Kaminetzky Dec.") ¶¶ 10–11.

12.  Plaintiff Kamin Health is not a party to the Williamsburg Operating Agreement and does receive any direct benefit from it. Further, Plaintiff did not grant U C Management authority to enter into any arbitration agreement on its behalf, and Plaintiff did not agree to arbitrate any claims with Defendants.

13.  The two companies (Plaintiff Kamin Health and the affiliate U C Management) are separate entities, with separate ownership structures. U C Management was created

specifically to participate in the Williamsburg facility, with the specific intention of keeping that business separate from the other urgent care businesses.

14. Contrary to the insinuation in Defendants' motion papers that religion is a factor in evaluating the "background of the arbitration provision," ECF no. 19-17 ("Opp."), at 9, fn.6, this was never discussed. These motion papers are the first time I have heard Defendants' theory that the arbitration provision "appli[es] to any entity that the parties were involved with," *id.*, and that is not my understanding of the provision.

15. On the contrary, as the Court has may recognize by the filing of this litigation, Plaintiff has no objection to "secular courts."

### III. Defendants used Plaintiff's intellectual property.

16. In their instant papers, Defendants admit that they used and controlled the use of Plaintiff's intellectual property long after the former urgent care business closed on September 17, 2020. Indeed, Defendant Halperin admits that he "own[s] (through another company of [his]) the building that is at issue here." Halperin Dec. ¶ 3.

17. Mr. Halperin also admits that in November 2020, he found "a new tenant for [his] building that was willing to enter into an immediate lease and commence *its own* urgent care operations." *Id.* ¶¶ 32–33.

18. Apparently, Mr. Halperin led the new tenant to believe that it could use Plaintiff's logo, signage, and branding. As demonstrated in the sworn statements and photographs submitted with Plaintiff's moving papers, market confusion ensued. *See* Kaminetzky Dec., ECF no. 13-2 ¶¶ 13–19; Declaration of Ari Efron, sworn December 31, 2020, ECF no. 13-3 ("Efron Dec.").

19. Consequently, Plaintiff sent a cease and desist letter by email on November 12, 2020. *See* accompanying Declaration of Adam Pollock, sworn January 26, 2021 ¶ 1 & Exh. 1.

Having heard no substantive response, Plaintiff sent another warning letter on November 16, 2020. *Id.* ¶ 2 & Exh. 2. Still hearing no response, Plaintiff's counsel emailed Defendants yet again on November 17, 2020. Defendants continued to ignore the demands. *Id.* ¶ 3 & Exh. 3.

20. During a December 14, 2020 phone call, Defendants' counsel advised Plaintiff's counsel that the Kamin Health signage had been removed. *Id.* ¶ 4. The assertion was inaccurate. Defense counsel's statement appeared to be based perhaps on the removal of the Kamin Health name (but not the logo) from the signage outside the building. The Kamin Health branded materials and signage continued to be used inside the building, including the Kamin Health name.

21. As demonstrated in the Declaration of Mr. Efron, on December 17, 2020, Kamin Health's trademarked materials, including signage and the Kamin name, were still in use inside and outside the Williamsburg facility. *See* Efron Dec., ECF no. 13-3.

22. In fact, Mr. Halperin took down and covered up the signage later, now coyly stating that his newly submitted photos are from "post December 17, 2020," without specifying *when* he acted.

23. Mr. Halperin admits that he controls the signage. Halperin Dec., ECF no. 20 ¶ 36 ("I set about taking the steps necessary to remove the Kamin name from all of the signage."); *id.* ¶ 41 ("I caused the exterior references in the building to the Kamin name to be removed, and the tenant removed all interior references to the same.").

24. In light of the motion for a preliminary injunction, Defendants claim to have removed or at least covered up *most* of the branding and signage.

25. Yet even now, rather than simply removing the entire Kamin logo from outside the building, Mr. Halperin has apparently hired a contractor on two separate occasions to remove pieces of the logo, in an apparent attempt to retain as much of it as possible for as long as possible.

26. Similarly, rather than removing interior signage, Mr. Halperin apparently placed (or instructed someone to place) stickers over certain portions of the signage, giving it a graffitied appearance that is counter to the "posh" brand that Kamin has worked hard to establish.

27. Of course, this does nothing to mitigate the confusion detailed in my initial submission. Instead, it creates the impression that the Williamsburg facility is a badly run Kamin operation that cannot even maintain its signage.

28. Further, stickering over the signs rather than removing and returning them makes it impossible to know whether the signage actually remains covered. Given the history here, Plaintiff suspects that the stickers may be removed at Defendants' convenience.

29. While Mr. Halperin claims he is too busy to remove Plaintiff's branded materials because of the pandemic, this only highlights the damages caused by their continued use. It is clear that the Williamsburg facility is not well-run. Staff apparently does not wear masks, Kaminetzky Dec., ECF no. 13-2, ¶ 18, and now Mr. Halperin advises that everyone is too busy to stop infringing Plaintiff's trademarks. That is not a well-managed facility, and it is clear that Defendants will not stop misusing Plaintiff's branded materials without a court order.

**IV. Defendants leave out several key details concerning their business dispute with U C Management.**

30. I disagree with Mr. Halperin's interpretation of the Operating Agreement as allowing him to unilaterally remove me as a manager and member. Back in July 2019, Mr. Halperin sent a "notice a removal," which was contested in Beth Din. The Beth Din never ruled on whether removal was merited.

31. Plaintiff Kamin Health is not a party to that arbitration, and the Beth Din has not been asked to rule and is not expected to rule on any issues concerning Plaintiff's trademarks.

32. In the arbitration, the Beth Din ordered that Kamin Health funds be "deposited only into the operating account of Kamin Health Williamsburg LLC," and not comingled with other businesses. (Dkt. no. 11.) Under the operating agreement, Kamin Health is <u>required</u> to bank at <u>Chase Bank</u> unless the members agree to a different bank (Op. Agr. § 11), and U C Management followed the tribunal's order by depositing funds of the Williamsburg LLC only in the business's operating account.

33. Mr. Halperin then sought a TRO seeking a substantially similar order from the New York state court. Since I was complying and intended to continue complying with the Beth Din order, I had no reason to oppose this request. (Effectively, I saw it as ordering me to do something I was already doing.)

34. However, I was mistaken because Mr. Halperin's proposed TRO and PI (as entered by the Court), included a new additional term—i.e., a specific bank provision requirement mandating that all funds "must be deposited into the <u>TD Bank</u> operating account of Kamin Health Williamsburg LLC ending in 4683." ECF nos. 19-11, 19-12.

35. TD Bank does not appear in the Beth Din order, and did not appear in the requested relief in Mr. Halperin's state court Petition. Consequently, I was initially unaware of this new requirement. This oversight concerning the newly-inserted provision requiring TD Bank later became a source of confusion, acrimony, and motion practice.

36. On December 23, 2019, Mr. Halperin's counsel first raised the issue of using TD Bank instead of Chase Bank. We immediately sought his cooperation to move the Company's operating account from Chase to TD. Because his cooperation was not forthcoming, we promptly applied to the New York court for relief from that limited portion of the order. Meanwhile, we kept trying to work out the bank account issue. But Mr. Halperin's counsel eventually responded that his client "[wa]s not interested in working out a way to proceed together." *Id.* ¶ 22.

Meanwhile, the Company continued to use Chase Bank, as required by the operating agreement. (I was also under the mistaken impression that the TD Bank account was a personal account of Mr. Halperin's. Some six months later, on June 24, 2020, Mr. Halperin eventually submitted paperwork showing that it was actually a business account.)

37. ***Importantly***, none of the business's funds were ever "diverted," as Mr. Halperin claims. The business deposited all of the business's revenues in the business's bank account at Chase, as required by the business's operating account.

38. Thus, Mr. Halperin's claims that I "diverted in excess of $750,000" from the business are completely false. The funds were not "diverted"; they were deposited in the business's operating account at Chase Bank and used to pay business's operating expenses.

39. Consequently, while Mr. Halperin has a dispute with me and U C Management about which bank was being used for the business's operating account (Chase Bank v. TD Bank), a dispute which is now the subject of Mr. Halperin's contempt motion pending in state court, the only actual sense in which any funds were "diverted" is inasmuch as they were deposited in the business's bank account at Chase and not at TD.[1]

**V.      The Winding Down and the Assignment for the Benefit of Creditors**

40. Under the operating agreement, I was designated as the Manager. (Op. Agr. § 7.)

41. The operating agreement provides that the Manager should, if necessary, wind down the Company: "The Manager shall have the sole authority to dissolve and commence winding up and the liquidation of the LLC." (Op. Agr. § 16.)

---

[1] While not at issue here, we have submitted to the state court that no contempt is warranted because there were no actual damages caused by depositing the business's funds in its operating account at Chase Bank instead of TD Bank. *See Berkowitz v. Astro Moving & Storage, Co.*, 240 A.D.2d 450, 452 (2d Dep't 1997) (the party moving for contempt must "prove that he has suffered an actual loss or injury").

42. Because the business was not successful in this location, in September 2020, the urgent care center was closed and the employees were let go.

43. Pursuant to the authority granted in the operating agreement, I dissolved the Company and assigned its assets to the Assignee for the benefit of creditors. (In an "Assignment for the Benefit of Creditors" or "ABC" liquidation procedure under New York state law, the assets are distributed by the Assignee, similar to a federal bankruptcy proceeding where the assets are distributed by the bankruptcy trustee.) *See generally* New York City Bar, Non-Bankruptcy Alternatives To Restructurings And Asset Sales (Nov. 2010).[2]

44. In his current declaration, Mr. Halperin seeks to contest whether I was the Manager of the business. As noted above, Mr. Halperin previously (in or about July 2019) sought to have the Beth Din remove me from my role as manager. But the Beth Din never ruled on the issue. Indeed, in a recent letter to the Beth Din, Mr. Halperin acknowledged exactly that: there has been no determination of the issue: "…before this Beth Din could decide the issues of whether or not he was removed as manager of Kamin Health of Williamsburg").[3]

45. Mr. Halperin also argues that winding up the Company through an ABC proceeding violated the state court injunction. It did not. Nothing in the ABC assignment itself, which is required by statute, N.Y. Debt. & Cred. Law § 3, violates the injunction — the

---

[2] Available at: https://www.nycbar.org/pdf/report/uploads/20072001-NonBankruptcyAlternativestoRestructuringsandAssetSales.pdf

[3] Similarly, last fall, Mr. Halperin counsel wrote to my counsel: "my client's position is that your client has been contractually expelled from Kamin Health Williamsburg ('KHW') and has no further rights or benefits with respect to that entity. My client, however, recognizes that your client contests that fact in the pending Beth Din and, to the extent that the issue is before that tribunal, it is 'in dispute.'"

Assignment itself does not move any funds. Nor do the plain terms of the injunction apply to the Assignor or bar a federal or state bankruptcy proceeding.

46. Mr. Halperin's papers also reference a "psak" (order), dated December 22, 2020, which he obtained from the Beth Din and which asserts that I must revoke the ABC assignment. But this order was improperly obtained, immediately issued (within a day of Mr. Halperin's request) without even giving me an opportunity to be heard, and is contrary to the law and public policy. While that issue is for litigation in state court, and not here, I note that an ABC assignment is irrevocable under New York state law.

47. Overall, while Mr. Halperin and I clearly have a business dispute with respect to the now-shuttered Williamsburg location, none of that is related to the issue of whether Defendants (and their subtenant) can use Plaintiff Kamin Health's trademarks.

## VI. Conclusion

48. Absent an injunction, Plaintiff will continue to (a) lose business from loyal customers who are being fooled into thinking that the Williamsburg facility is a high-quality Kamin facility; (b) lose business from customers who would otherwise seek medical care and services at a legitimate Kamin Health location (including the Kamin Health Urgent Care Center in the Crown Heights section of Brooklyn) ; and (c) suffer damage to its reputation and brand when customers experience poor medical care at Defendants' Williamsburg urgent care and incorrectly attribute it to Kamin Health.

49. Accordingly, I respectfully ask that the Court enter the preliminary injunction enjoining defendants Pinchas Halperin and Pinchas Halperin LLC from using the trademarks of

Kamin Health in Defendants' exterior and interior signage, advertisements and promotional materials, websites, domains, or other products or materials

50. I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 26, 2021

By: _____
Yitzchok Kaminetzky