UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

KAMIN HEALTH LLC,

                              Plaintiff,

            -against-

PINCHAS HALPERIN and PINCHAS
HALPERIN LLC,

                              Defendants.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**
20-CV-05574 (DG) (RML)

DIANE GUJARATI, United States District Judge:

      Plaintiff Kamin Health LLC commenced this action against Defendants Pinchas Halperin

and Pinchas Halperin LLC on November 16, 2020, alleging trademark infringement and passing

off in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); use of name with intent

to deceive and trademark dilution under New York General Business Law §§ 133, 360-1; and

common law trademark infringement, injury to business reputation, unfair competition and

misappropriation, and unjust enrichment.  Complaint ("Compl."), ECF No. 1.  On December 31,

2020, Plaintiff filed a motion for a preliminary injunction.  Motion for Preliminary Injunction

("Pl.'s Mot."), ECF No. 13; Memorandum of Law in Support of Plaintiff's Motion ("Pl.'s

Mem."), ECF No. 13-1.  On January 19, 2021, Defendants opposed that motion and filed a cross

motion to compel arbitration.  Defendants' Cross Motion to Compel Arbitration ("Defs.' Mot."),

ECF No. 19; Defendants' Memorandum in Opposition to Plaintiff's Motion and in Support of

Defendants' Motion ("Defs.' Mem."), ECF No. 19-17.  The notice of cross motion was amended

the following day to correct a clerical error only.  ECF No. 21.[1]  Plaintiff opposed the cross

---

[1]  Although the notice of cross motion was amended, the memorandum and all supporting
documents filed with ECF No. 19 remained the same.  Plaintiff styled its response as a
response to the original cross motion (ECF Nos. 19 and 20), not a response to ECF No. 21,

motion to compel arbitration.  Plaintiff's Reply in Support of Plaintiff's Motion and in Opposition to Defendants' Motion ("Pl.'s Reply"), ECF No. 22.  Oral argument on Plaintiff's motion for injunctive relief and on Defendants' cross motion to compel arbitration was held on February 5, 2021.  ECF No. 25.

For the reasons set forth below, the Court grants Defendants' cross motion to compel arbitration, denies Plaintiff's motion for a preliminary injunction, and stays this case pending the results of arbitration.

## BACKGROUND

### I.      Factual Background

Plaintiff Kamin Health LLC claims to be "the exclusive owner of the Kamin Health name and brand, including any and all trademarks relating thereto."  Compl. ¶ 13.[2]  Plaintiff's business at least partly involves selectively arranging for others to use its brand and trademark in "operating urgent care centers or other medical-related facilities," *id.  See id.* ¶ 18; *see also* Declaration of Yitzchok Kaminetzky in Support of Plaintiff's Reply ("Reply Kaminetzky Decl.") ¶¶ 10-11, ECF No. 22-1.  The resulting "Kamin Health network" extends throughout the New York City metropolitan region, with medical care centers in Borough Park, Crown Heights, and Fresh Meadows.  Compl. ¶ 2; Declaration of Yitzchok Kaminetzky ("Kaminetzky Decl.") ¶¶ 6-7, ECF No. 13-2.

---

and the docket entry for oral argument on the cross motion, ECF No. 25, references ECF No. 19, not ECF No. 21.

[2]    It is unclear whether Plaintiff claims to own just one trademark or multiple marks, as Plaintiff's briefing alternates between using the words "trademark" and "mark" in the plural and in the singular.  *See, e.g.*, Pl.'s Mem. at 1, 8-9, 12, 14.  Because the parties' briefing mostly discusses just one mark, and because the number of marks does not alter the Court's analysis, the Court refers to trademark in the singular.

The "Kamin Health" name derives from the last name of Yitzchok *Kamin*etzky, Plaintiff's president and CEO and its (at least partial) owner.  Kaminetzky Decl. ¶¶ 1, 3; *compare* Answer ¶ 13, ECF No. 11 (describing Mr. Kaminetzky as Plaintiff's "owner"), *with* Reply Kaminetzky Decl. ¶ 9 (describing Mr. Kaminetzky as one of Plaintiff's three co-owners).  In addition to the "Kamin" or "Kamin Health" name, Plaintiff's branding features a red and white color scheme and a geometric logo.  Kaminetzky Decl. ¶ 4.  Plaintiff has "continually invested in its reputation through various advertising campaigns that make use of its trademark name and brand" and has been involved "in a continuous effort to support the brand."  Compl. ¶ 14; *see also* Kaminetzky Decl. ¶ 5.  Indeed, Plaintiff has "likely invested hundreds of thousands of dollars in branding and advertising" with the goal of strengthening its brand.  Kaminetzky Decl. ¶ 5.

The present action concerns an urgent care clinic in Williamsburg (the "Williamsburg Clinic") that was part of the "Kamin Health network" until September 2020.  *Id.* ¶ 7; Compl. ¶¶ 16-20.[3]  The Williamsburg Clinic was operated by Kamin Health Williamsburg LLC, an entity half-owned by UC Management LLC and half-owned by Defendant Pinchas Halperin LLC.  Compl. ¶ 16.  UC Management LLC, an "affiliated entity" of Plaintiff, *id.* ¶ 18, is another company owned by Mr. Kaminetzky, Answer ¶ 13.  Individual Defendant Pinchas Halperin is the sole principal and owner of Pinchas Halperin LLC.  Compl. ¶ 9.

---

[3]   Defendants do not appear to contest the existence of the "Kamin Health network," but appear to take issue with the term "network" insofar as it suggests that the Williamsburg Clinic had some formal relationship with the other urgent care centers using the "Kamin Health" name.  *See* Answer ¶ 5.  The Court uses the term "network" herein not to refer to some system of businesses bound by formal legal connections but, rather, as Plaintiff appears to use the term – i.e., to reference the universe of urgent care centers using the "Kamin Health" name.

Mr. Kaminetzky and Mr. Halperin, via their respective companies, set up the Williamsburg Clinic through the KHW Operating Agreement (the "Operating Agreement"), ECF No. 19-2.  *See* Decl. of Pinchas Halperin ("Halperin Decl.") ¶¶ 7-9, ECF No. 20.  As set forth in the Operating Agreement, Mr. Halperin arranged for the building, which he owned through a separate LLC.  Kaminetzky Decl. ¶ 9; *see also* Operating Agreement at 4.  Meanwhile, Plaintiff – Kamin Health LLC, of which Mr. Kaminetzky is the president and CEO, Kaminetzky Decl. ¶ 1 – "allowed its affiliated entity UC Management LLC to make use of the Kamin Health brand, name, and trademarks," *id.* ¶ 10; *see also* Reply Kaminetzky Decl. ¶ 11.  UC Management LLC, in turn, "granted a limited license to Kamin Health Williamsburg LLC, allowing [it] to make use of the Kamin Health brand, name, and trademarks, in connection with the operation of the Williamsburg urgent care center."  Compl. ¶ 18.  Specifically, the Operating Agreement provided:

> Kamin[4] shall contribute the license to the use of the brand name "Kamin Health" by the LLC [that is, Kamin Health Williamsburg LLC], at no cost, which license shall continue for so long as Kamin owns its membership interest in the LLC.

Operating Agreement at 4.

The Operating Agreement further designated Mr. Kaminetzky as the Williamsburg Clinic's "manager," giving him, "except as otherwise provided in [the Operating] Agreement, . . . exclusive and full power with respect to [the Williamsburg Clinic's] management and control."  *Id.* at 3.

Despite the "Kamin" name's appearance throughout the Operating Agreement, Plaintiff was not a signatory to the Operating Agreement.  *Id.* at 1, 17; Reply Kaminetzky Decl. ¶ 12.

---

4   The term "Kamin," as used in the Operating Agreement, refers not to Plaintiff but to UC Management LLC.  Operating Agreement at 1.

Indeed, Plaintiff alleges that "UC Management [LLC] was created specifically to participate in the Williamsburg facility, with the specific intention of keeping that business separate from [Plaintiff's] other urgent care businesses." Reply Kaminetzky Decl. ¶ 13. Even so, because of the role Mr. Kaminetzky played in the Operating Agreement's creation, Plaintiff understood that its brand name was being licensed to the Williamsburg Clinic, as Plaintiff acknowledges. *See* Transcript of Feb. 5, 2021 Oral Argument ("Tr.") at 17, ECF No. 27 (explaining that, because the involved parties were "all the affiliates," Plaintiff knew it was "allow[ing] its brand to be used" at the Williamsburg Clinic); *see also* Operating Agreement at 17 (bearing Mr. Kaminetzky's signature twice, including as "Manager").

The Operating Agreement also included an arbitration clause, which provided in full:

> Any and all controversy, claim, dispute, etc., in any way relating to, arising under or resulting from this Agreement shall, in accord with Jewish Law, be submitted for arbitration to Bais Hora'ah Etz Chaim in Brooklyn, New York, under the leadership of Harav Chaim Kohn or as mutually agreed otherwise ("Rabbinical Court") and not to any secular court, tribunal or the like except upon written permission of said Rabbinical Court. The Rabbinical Court may award monetary damages or direct specific performance or allow such other remedy as it may deem appropriate including the issuance of an "IKEL" and such Rabbinical Court's decision/order/—award (collectively, "Award") shall be final and binding on the parties. The rules and conduct of said arbitration proceedings shall be as determined by said Rabbinical Court, in its sole and absolute discretion, except if expressly prohibited by law. The cost for said Rabbinical Court proceedings shall be borne equally by the parties unless said Rabbinical Court directs otherwise. Judgment upon the Award rendered may be entered in any court having jurisdiction thereof.

Operating Agreement at 13.

After the Williamsburg Clinic had been operating for at least six or seven months,[5] the "owners of the Williamsburg urgent care . . . became embroiled in a business dispute," and the

---

[5]   The parties have given varying estimates as to how long the Williamsburg Clinic stayed open, using the "Kamin Health" name. *Compare* Defs.' Mem. at 5 ("over a year"), *with* Tr. at 8

clinic ceased operations on September 17, 2020.  Compl. ¶¶ 19-20.  That dispute has been the

subject of arbitration and state court litigation proceedings, none of which involves Plaintiff.  *Id.*

¶ 19; Halperin Decl. ¶¶ 12-24.

Plaintiff asserts that, after the Williamsburg Clinic's closure, Defendants launched their

own, separate urgent care center at the same location but continued "using signage, forms, and

other materials that were improperly taken from the prior operations."  Kaminetzky Decl. ¶ 13;

Compl. ¶¶ 21-23.  That is, Defendants have been "effectively passing themselves off as the same

entity [as before], in direct violation of Kamin Health LLC's trademark rights . . . ."  Compl.

¶ 21.  Plaintiff contends that neither it nor UC Management LLC authorized Defendants to

continue to use the trademark, signage, or materials at issue.  Kaminetzky Decl. ¶ 15.

Plaintiff alleges that this misuse has already confused various customers by giving them

the impression that Defendants' urgent care center is a "Kamin Health" facility.  Compl. ¶¶ 23-

24.  For example, one customer allegedly reached out to Mr. Kaminetzky with concerns about

"the Kamin in Williamsburg" lacking COVID-19 safety precautions: "The owner doesn't wear a

mask and didn't make anyone else there wear a mask—insanity!!"  Kaminetzky Decl. ¶ 18.

When informed by Mr. Kaminetzky that "Kamin" had closed its operation at that location, the

customer allegedly responded, "WHAT?! I was just there! . . . I just got a covid test there[.]  It

said Kamin on the sign!"  *Id.*

Over the course of this litigation, Defendants have modified the signage in use at the

clinic in Williamsburg.  At least as of January 19, 2021, the signage had been altered to feature

an edited version of Plaintiff's logo.  Halperin Decl. ¶¶ 36-38.  According to Plaintiff,

---

("six or seven months"), *with* Compl. ¶¶ 16, 20 (explaining that Kamin Health Williamsburg
LLC was formed on October 18, 2018 and that the Williamsburg Clinic closed on September
17, 2020).

Defendants have also "placed (or instructed someone to place) stickers over certain portions of the [building's interior] signage, giving it a graffitied appearance that is counter to the 'posh' brand that [Plaintiff] has worked hard to establish."  Reply Kaminetzky Decl. ¶ 26.

## II.   Procedural Background

On November 16, 2020, Plaintiff filed suit in this Court, asserting eight causes of action, including claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Compl. ¶¶ 34-63.

On December 31, 2020, Plaintiff moved this Court for a preliminary injunction barring Defendants and their associates from, among other things, using the "Kamin Health" name or trademark in marketing or otherwise promoting their business, products, or services.  Pl.'s Mot.

On January 19, 2021, Defendants filed a cross motion to compel arbitration, arguing that Plaintiff must arbitrate its claims based on the arbitration clause in the Operating Agreement between UC Management LLC and Pinchas Halperin LLC.  Defs.' Mot.; Defs.' Mem.  The next day, Defendants filed an amended notice of cross motion, which corrected a clerical error in the previous filing in the title used to refer to Defendants.  ECF No. 21.

On February 5, 2021, the Court heard oral argument on Plaintiff's motion for injunctive relief and Defendants' cross motion to compel arbitration.   ECF No. 25.

## DISCUSSION

For the reasons set forth below, the Court concludes that the Operating Agreement's arbitration clause binds Plaintiff and covers the instant claims.  As a result, the Court denies Plaintiff's request for injunctive relief and stays this case pending the results of arbitration.

## I.   Applicable Law

The Court must evaluate a motion to compel arbitration pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 4, using a standard similar to that for a summary

judgment motion.  *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."  *Id*. (citing 9 U.S.C. § 4).  Yet, "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the Court] may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'"  *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011) (quoting *Bensadoun*, 316 F.3d at 175); *see also Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561-62 (S.D.N.Y. 2013) ("[A] [c]ourt must grant a motion to compel arbitration if the pleadings, discovery materials before the [c]ourt, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.").

The party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."  *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010); *accord Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000). "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried."  *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

This standard reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution."  *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001)).  That policy stands so strong, in fact, that the United States Court of Appeals for the Second Circuit has noted that "it is difficult to overstate the strong federal policy in favor of

8

arbitration, and it is a policy we 'have often and emphatically applied.'" *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) (quoting *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995)).

When considering a motion to compel arbitration, courts must resolve two questions. A court must determine "first, 'whether there exists a valid agreement to arbitrate at all under the contract in question,' and second, 'whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement.'" *Abeona Therapeutics, Inc. v. EB Rsch. P'ship, Inc.*, No. 18-CV-10889, 2019 WL 623864, at *2 (S.D.N.Y. Feb. 14, 2019) (quoting *Nat'l Union Fire Ins. Co. v. Belco Petrol. Corp.*, 88 F.3d 129, 135 (2d Cir. 1996)).  Where the parties have formed a valid arbitration agreement, a court must apply a presumption of arbitrability in interpreting whether that agreement covers the dispute at hand. *See Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 269 (2d Cir. 2015).  "This presumption, however, does not apply to the threshold question of whether the parties agreed to arbitrate at all." *Abeona Therapeutics*, 2019 WL 623864, at *2 (citing *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010)).  "In other words, while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) (quoting *Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)).

Because arbitration has its roots in contract law, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  Accordingly, despite the "'liberal federal policy

favoring arbitration agreements,' [an arbitration agreement] must not be so broadly construed as to encompass claims and parties that were not intended by the original contract." *Id*. (citation omitted) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)).

However, a party cannot always escape an arbitration agreement simply by asserting that it never *signed* the agreement.  Indeed, there are instances in which "ordinary principles of contract and agency" require a court to interpret an arbitration agreement as binding even a *non*signatory.  *Id*. (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)).  The Second Circuit has recognized five theories under which an arbitration agreement may bind a nonsignatory: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." *Id.*; *see also Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 273 (S.D.N.Y. 2011).

## II.    Defendants' Cross Motion to Compel Arbitration is Granted

Beginning with Defendants' cross motion to compel arbitration, the Court concludes: (1) that the Operating Agreement's arbitration clause binds Plaintiff; and (2) that Plaintiff's claims fall within that clause's scope.

### A.    The Arbitration Clause Binds Plaintiff Under a Theory of Estoppel

The facts before the Court reveal that the Operating Agreement's arbitration clause binds Plaintiff under a theory of estoppel, even though Plaintiff was not a signatory to the Operating Agreement.[6]

---

[6]  Defendants expressly rely on two of the theories recognized by the Second Circuit for binding nonsignatories to arbitration agreements, estoppel and agency, Defs.' Mem. at 4-9, and have intentionally foregone a veil-piercing argument, Tr. at 7.  Because the Court concludes that Plaintiff is estopped from avoiding arbitration, the Court does not opine on whether Plaintiff

The Second Circuit recognizes two types of estoppel cases in this context.  The first type – which is more typical – involves a *signatory* to an arbitration agreement seeking to bind a *non*signatory to that agreement.  *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97-98 (2d Cir. 1999); *see, e.g.*, *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999).  The second type involves the opposite scenario – that is, a *non*signatory relying on an arbitration agreement to compel arbitration with a *signatory* to the agreement.  *See Thomson-CSF*, 64 F.3d at 778-79; *see also, e.g.*, *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 755, 757-58 (11th Cir. 1993), *cert. denied*, 513 U.S. 869 (1994).  This case plainly falls in the first category, as Defendants acknowledge, Defs.' Mem. at 5.[7]

Although not voluminous, the body of cases addressing estoppel in the context of a signatory to an arbitration agreement attempting to bind a nonsignatory teaches that "[a] nonsignatory may be estopped from avoiding arbitration where it 'knowingly accepted the benefits of an agreement with an arbitration clause.'"  *Bank of Am. Nat'l Assn. v. Sopher*, No. 10-CV-8870, 2011 WL 2419872, at *3 (S.D.N.Y. June 8, 2011) (quoting *MAG Portfolio*

---

also is bound by the Operating Agreement under a theory of agency or under any of the three other theories recognized by the Second Circuit.

[7]  Defendants nevertheless muster several cases of the second type.  Defs.' Mem. at 6-8 (citing *Sunkist Soft Drinks*, 10 F.3d at 757-78; *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-21 (4th Cir. 1988); *Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 203-04 (S.D.N.Y. 2000); *Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, No. 98-CV-7181, 1999 WL 637236, at *5-7 (S.D.N.Y. Aug. 20, 1999); and *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, No. 97-CV-7102, 1998 WL 314767, at *3 (S.D.N.Y. June 15, 1998)).  The Second Circuit has, however, considered several of the cases cited by Defendants and deemed them "inapposite and insufficient justification for binding" a nonsignatory, as compared to a signatory, to an arbitration agreement.  *Thomson-CSF*, 64 F.3d at 779 (distinguishing *Sunkist Soft Drinks*, 10 F.3d at 757-78 and *J.J. Ryan & Sons, Inc.*, 863 F.2d at 320-21).  This Court agrees that those cases are not particularly instructive here, where Defendants seek to bind a *non*signatory to an arbitration clause.

11

*Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)); *see also*

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993).  The

caselaw further teaches that the nonsignatory's benefit must be a "direct" one, meaning it must

"flow[] directly from the agreement."  *Oppenheimer Co. Inc. v. Deutsche Bank AG*, No.

09-CV-8154, 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010) (quoting *MAG Portfolio*, 268

F.3d at 61).  A benefit is indirect – and therefore cannot support estoppel – "where the

nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit

(and thereby assume) the agreement itself."  *Republic of Ecuador v. ChevronTexaco Corp.*, 499

F. Supp. 2d 452, 458 (S.D.N.Y. 2007) (quoting *MAG Portfolio*, 268 F.3d at 61).  Put differently,

"benefits are direct when specifically contemplated by the relevant parties; and benefits are

indirect when the parties to the agreement with the arbitration clause would not have originally

contemplated the non-signatory's eventual benefit."  *Life Techs. Corp.*, 803 F. Supp. 2d at 276.

Here, the Operating Agreement directly benefitted Plaintiff by providing for the creation

and operation of an additional branded urgent care center in the "Kamin Health network,"

Kaminetzky Decl. ¶ 7.  The Operating Agreement did not explicitly provide for Plaintiff's

financial compensation in exchange for the use of its trademark and brand; indeed, Plaintiff

apparently permitted UC Management LLC (and, consequently, Kamin Health Williamsburg

LLC) to use its trademark and brand "at no cost."  Operating Agreement at 4.  However, Plaintiff

places great value on its intellectual property, which Plaintiff has spent "hundreds of thousands

of dollars" maintaining.  Kaminetzky Decl. ¶ 5; *see also* Reply Kaminetzky Decl. ¶ 7 (explaining

that, "[b]ecause the [Kamin Health] logo was already known and valuable . . . [Plaintiff's]

marketing team made a concerted effort to create brand recognition for both the name and the

trade dress" and that "[t]hese efforts continue today").  Plaintiff therefore benefits from activity

strengthening or otherwise enhancing its brand.  *See WTA Tour, Inc. v. Super Slam Ltd.*, 339 F.

Supp. 3d 390, 401 (S.D.N.Y. 2018) (recognizing that a "reputational benefit" may qualify as a

direct benefit for purposes of estoppel in the arbitration context); *cf. Bus. Trends Analysts v.*

*Freedonia Grp., Inc.*, 887 F.2d 399, 404 (2d Cir. 1989) (concluding that enhanced goodwill and

market recognition could be treated as profit under Section 504(b) of the Copyright Act).

  The Operating Agreement here was intended to promote and, at least for some time, *did*

promote Plaintiff's interest in enhancing the strength and reach of its brand.  Plaintiff permitted

the Williamsburg Clinic to use the "Kamin Health" name for at least six or seven months,

without objection, and has offered no explanation as to why it would have acquiesced to that

conduct without receiving any benefit in return.  Without any competing explanation, the record

points to one conclusion – that Plaintiff benefitted from adding another branded urgent care

center to its network.[8]

  That benefit was "direct" because it flowed *directly* from the Operating Agreement.  That

is, the parties to the Operating Agreement "specifically contemplated" that Plaintiff would enjoy

the benefit.  *Life Techs. Corp.*, 803 F. Supp. 2d at 276.   Indeed, it is hard to imagine how the

parties to the Operating Agreement might have arranged for the Williamsburg Clinic to use the

"Kamin Health" name *without* understanding that doing so would necessarily promote Plaintiff's

brand by expanding its urgent care network.[9]

---

[8] Plaintiff likely also benefitted from the Operating Agreement's designation of Mr.
Kaminetzky – a person Plaintiff could trust to protect and promote the "Kamin Health" brand
– as "manager" of the Williamsburg Clinic, Operating Agreement at 3.  The Court does not,
however, rely in its estoppel analysis on this likely benefit and therefore need not determine
whether it would be a "direct" or "indirect" benefit.

[9] In their briefing, Defendants describe Plaintiff's benefit simply as "a fifty-percent interest [in
the Williamsburg Clinic] given to [Plaintiff's] President."  Defs.' Mem. at 5.  At argument,
however, Defendants identified an additional benefit: "the benefit of having another entity in
yet another location that is using what [Plaintiff] claim[s] is their trademark ostensibly for

Here, the Court finds a case from the Southern District of New York to be particularly instructive.[10]  In *WTA Tour*, a retired Romanian tennis star named Ion Tiriac arranged for one of his companies, Super Slam Limited ("Super Slam"), to enter into a membership agreement with WTA Tour, Inc. ("WTA") in 2008.  339 F. Supp. 3d at 395-96.  The agreement required Super Slam to arbitrate any dispute arising out of or relating to the agreement.  *Id.* at 396.  As a result of the membership agreement, Super Slam gained ownership of the Madrid Open, an esteemed tennis tournament.  *Id.*  All went smoothly until the 2017 tournament, which inspired several parties to file lawsuits in Cyprus, Romania, and Spain, including at least two suits brought by Mr. Tiriac against WTA.  *Id.* at 397.  Back in the United States, WTA moved to compel Mr. Tiriac to arbitrate his claims pursuant to the membership agreement between Super Slam and WTA, even though Mr. Tiriac never signed the agreement himself.  *Id.* at 397-98.

The *WTA Tour* court held that Mr. Tiriac's claims were subject to arbitration because he had "directly benefitted from the Membership Agreement," despite not having signed it.  *Id.* at 400-01.  In reaching that conclusion, the court noted that Mr. Tiriac had been the one who

---

promotion of further goodwill for them."  Tr. at 6-7.  It is the latter type of benefit that supports a theory of estoppel here.

[10]  In contrast, none of the few Second Circuit cases addressing what constitutes a "direct benefit" applies neatly to the facts at hand.  *See Tencara Shipyard*, 170 F.3d at 353 (binding nonsignatory prospective ship owners to an arbitration clause based on the direct benefits they received from the ship's classification agreement, which entitled them to lower insurance rates and the right to sail under the French flag); *Thomson-CSF*, 64 F.3d at 778-79 (holding that an exclusive dealing agreement did not *directly* benefit a non-party to that agreement where the non-party leveraged the agreement to gain an advantage over its competitor); *Deloitte Noraudit*, 9 F.3d at 1064 (holding that Deloitte Noraudit received a direct benefit by using the Deloitte name after failing to object to a settlement agreement concerning that name's use and "knowingly accept[ing] the benefits" of that agreement); *see also MAG Portfolio*, 268 F.3d 58, 61-63 (declining to recognize a direct benefit where "there [was] no relationship between the signatories and the nonsignatory except that they [were] competitors for the same business").

originally requested that Super Slam and WTA enter into the agreement and that the parties
"understood Tiriac to be the real party in interest and the true owner of the Madrid Open." *Id.* at
401.  Furthermore, Mr. Tiriac "represented himself to the press as owning the [Madrid] Open."
*Id.*  Indeed, the winner of the Madrid Open received the "Ion Tiriac trophy" in a ceremony in
which "guests of [Tiriac's] choice participate[d]." *Id.*  As the court neatly put it, Mr. Tiriac
received "a direct reputational benefit from the fact that his wholly-owned company r[an] a
prestigious tennis tournament featuring a lavish trophy named in his honor." *Id.*

    The instant case bears a persuasive resemblance to *WTA Tour*.  In both cases, the
nonsignatory seeking to avoid arbitration had some involvement in the creation of the agreement
with the arbitration clause.  In *WTA Tour*, Mr. Tiriac himself "requested" the membership
agreement, 339 F. Supp. 3d at 401; here, Plaintiff was involved in the Operating Agreement's
creation by assenting in advance to letting the Williamsburg Clinic use its name, Operating
Agreement at 4.  *Cf. Hofer v. Emley*, No.19-CV-02205, 2019 WL 4575389, at *6 (N.D. Cal.
Sept. 20, 2019) (compelling arbitration on a direct benefit estoppel theory where plaintiff, who
sought to escape an arbitration clause in a car sharing app's terms of service on the theory that it
was his brother, rather than he, who had ultimately rented the car, "was an active participant in
renting the car, and at the very least aware that his brother rented the car from [defendant]").  In
addition, the agreements in both cases resulted in similar benefits, which benefits the
nonsignatories accepted.  In *WTA Tour*, the membership agreement led to Mr. Tiriac's name
appearing in connection with a prestigious tennis tournament and Mr. Tiriac "represented
himself to the press as owning the [Madrid] Open," 339 F. Supp. 3d at 401; here, the Operating
Agreement led to Plaintiff's name appearing on another branded urgent care center and Plaintiff
considered the Williamsburg Clinic part of its "Kamin Health network," Kaminetzky Decl. ¶ 7.

Just as the *WTA Tour* court concluded that Mr. Tiriac received a direct benefit from the membership agreement, this Court concludes that Plaintiff received a direct benefit from the Operating Agreement.

The Court need not determine whether the use of a company's brand name or trademark in every instance bestows a direct benefit upon that company to conclude that a direct benefit existed here, where Plaintiff assented to an agreement by which one of its affiliate companies would use Plaintiff's brand name in operating an urgent care center; where that agreement added yet another urgent care center to Plaintiff's existing network; and where the agreement resulted in that urgent care center using Plaintiff's brand name and trademark for over six months, with Plaintiff's knowledge and without Plaintiff's objection.  Relying on these facts, the Court holds that Plaintiff directly benefitted from the Operating Agreement and so, under principles of estoppel, must comply with the Operating Agreement's arbitration clause.

### B.      Plaintiff's Claims Fall within the Arbitration Clause's Scope

Having determined that the Operating Agreement's arbitration clause binds Plaintiff, the Court must next determine whether the particular claims at issue fall within the clause's ambit. *See Abeona Therapeutics*, 2019 WL 623864, at *3 (citing *Nat'l Union Fire Ins. Co.*, 88 F.3d at 135).  The Court concludes that they do.

The Operating Agreement's arbitration clause reaches wide, covering "[a]ny and all controversy, claim, dispute, etc., *in any way* relating to, arising under or resulting from this Agreement."  *See* Operating Agreement at 13 (emphasis added).  Because that clause sweeps so broadly, it creates a presumption of arbitrability, which can be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."  *Duane Street*

*Assocs. v. Local 32B–32J*, No. 00-CV-3861, 2000 WL 802889, at \*2 (S.D.N.Y. June 21, 2000)

(quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)); *see also Jillian Mech. Corp. v. United Serv. Workers Union Local* 355, 882 F. Supp. 2d 358, 368 (E.D.N.Y. 2012).

The presumption of arbitrability has not been overcome here. The Operating Agreement's arbitration clause covers any dispute "in any way relating to" its provisions. Operating Agreement at 13. One of those provisions set forth the original terms for the "use of the brand name 'Kamin Health'" at an urgent care center in Williamsburg then partly owned by Defendants. *Id.* at 4. All of Plaintiff's claims turn on the theory that Defendants continued using the "Kamin Health" name *at the same site*, after their rights under the Operating Agreement expired. Faced with those facts, the Court cannot say "with positive assurance," *WorldCrisa Corp.*, 129 F.3d at 74 (quoting *Associated Brick Mason Contractors of Greater New York, Inc. v. Harrington*, 820 F.2d 31, 35 (2d Cir. 1987)), that the Operating Agreement's arbitration clause forecloses an interpretation under which it covers Plaintiff's claims. Indeed, the Operating Agreement created the very right that lies at the heart of this case – the right to use "the brand name 'Kamin Health'" at the Williamsburg site. *See* Operating Agreement at 4. Accordingly, and especially in light of the "broad presumption in favor of arbitration," *Abeona Therapeutics*, 2019 WL 623864, at \*3 (citing *Lloyd*, 791 F.3d at 269), the Court concludes that Plaintiff's claims fall subject to the Operating Agreement's arbitration clause.[11] The Court thus grants Defendants' cross motion to compel arbitration.

---

[11] The Court finds unpersuasive Plaintiff's argument, made in a footnote, that Plaintiff's claims "have nothing to do with the Operating Agreement or the [Kamin Health] Williamsburg LLC" because "the business is closed," Pl.'s Reply at 7 n.8, and notes that the Operating Agreement itself expressly forecloses this argument. *See* Operating Agreement at 15 (providing that "Provision 14 through 19 of this Agreement [which includes the arbitration clause in Provision 17] shall survive and continue to be in full force and effect after the termination of this Agreement"); *see also Jillian Mech. Corp.*, 882 F. Supp. 2d at 366 ("While it is true that

**III.    Plaintiff's Motion for Preliminary Injunction is Denied**

Given that Plaintiff must arbitrate its claims against Defendants, the Court denies

Plaintiff's motion for a preliminary injunction.  *See Citadel Servicing Corp. v. Castle Placement,*

*LLC*, 431 F. Supp. 3d 276, 290 (S.D.N.Y. 2019) (resolving a preliminary injunction motion and

cross motion to compel arbitration in the same way); *see also NuMSP, LLC v. St. Etienne*, 462 F.

Supp. 3d 330, 354 (S.D.N.Y. 2020) (same).

**IV.    The Case is Stayed Pending the Results of Arbitration**

Because Plaintiff must arbitrate its claims, the Court stays this case pending the results of

arbitration.  Despite Defendants' arguments to the contrary, Defs.' Mem. at 11-12, the Court

concludes that a stay, rather than dismissal, is appropriate here.  *See Katz v. Cellco P'ship*, 794

F.3d 341, 347 (2d Cir. 2015) ("[W]hile we recognize the impetus for a rule permitting dismissal,

we conclude that the text, structure, and underlying policy of the FAA mandate a stay of

proceedings when all of the claims in an action have been referred to arbitration and a stay

requested."); *see, e.g.*, *Jiangsu Guotai Int'l Grp. Guomao Corp., Ltd. v. JAD Int'l Incorporation*,

No. 18-CV-2699, 2019 WL 1227875, at *2 (S.D.N.Y. Mar. 15, 2019) ("[W]hether a stay is

mandatory or merely discretionary, the Court agrees with [plaintiff] that a stay is more

---

'[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any
dispute which he has not agreed so to submit,' even where the agreement has expired, the
arbitration duty may endure if the dispute at issue is 'over an obligation arguably created by
the expired agreement.'" (quoting *Nolde Bros., Inc. v. Local No. 358, Bakery &
Confectionary Workers Union*, 430 U.S. 243, 252 (1977))).

appropriate than dismissal to avoid unnecessary delay in the arbitral process due to appellate review.").

## CONCLUSION

For the reasons set forth above, Defendants' Cross Motion to Compel Arbitration is GRANTED, and Plaintiff's Motion for Preliminary Injunction is DENIED.  The Clerk of Court is ordered to terminate the motion at docket entry 21 and to stay the case, *see Katz*, 794 F.3d at 345.  The Clerk of Court is further ordered to close the case, without prejudice to either party moving by letter motion to reopen the case within thirty days of the conclusion of the arbitration proceedings.  *See Jiangsu Guotai Int'l Grp. Guomao Corp., Ltd.*, 2019 WL 1227875, at *2 (taking the same approach).

SO ORDERED.

*/s/ Diane Gujarati* _____
DIANE GUJARATI
United States District Judge

Dated:  March 15, 2021
         Brooklyn, New York